SAKRETE OF NORTHERN CALIFORNIA, INC., Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

No. 18745.

United States Court of Appeals Ninth Circuit.

May 21, 1964.

Rehearing Denied July 9, 1964.

Graydon, Head & Ritchey, William A. McKenzie, Leslie A. Meek, Cincinnati, Ohio, for petitioner.

Arnold Orman, Gen. Counsel, Dominick L. Manoli, Assoc. Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Warren M. Davison and Peter M. Giesey, Attys., N. L. R. B., Washington, D. C., for respondent.

Leon Ardzrooni, Neyhart & Grodin, San Francisco, Cal., on behalf of amicus curiae-Freight, Construction, General Drivers & Helpers, Local 287.

Before MADDEN, Judge of the Court of Claims, and HAMLEY and JERTBERG, Circuit Judges.

HAMLEY, Circuit Judge.

Sakrete of Northern California, Inc., brought this proceeding to review certain parts of a supplemental decision and order of the National Labor Relations Board reported at 140 N.L.R.B. 765.[1] The Board decision and order adopted, with certain modifications and additions, a supplemental intermediate report of the Board's trial examiner reported at 140 N.L.R.B. 767.

In his conclusions of law, thus adopted by the Board, the trial examiner held that in five different respects petitioner had engaged in unfair labor practices. Most of these practices were deemed to be detrimental to Freight, Construction, General Drivers and Helpers, Local 287, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America ("union"). The examiner's recommended order provided that petitioner shall cease and desist from each of these practices and these recommendations were accepted by the Board. The examiner's recommended order also provided that petitioner shall take certain remedial action, and these recommendations were accepted by the Board except that provisions concerning back pay and reinstatement were modified.

In the petition for review, it is alleged that the Board erred in asserting jurisdiction over petitioner, erred in ordering petitioner to cease and desist from the five practices specified in the order, and

erred with respect to two of the six kinds of remedial action ordered.

Pursuant to stipulation thereafter entered into, however, petitioner now questions only: (1) the Board's jurisdiction over petitioner under the National Labor Relations Act, as amended, 61 Stat. 136 et seq. (1947), 29 U.S.C. § 151 et seq. (1958), "Act"; (2) one of the trial examiner's findings of fact, namely the finding that petitioner had refused to bargain collectively with the union, in violation of section 8(a) (5) of the Act, 29 U.S.C. § 158(a) (5);[2] and (3) one of the remedial actions ordered, namely that petitioner, on request, bargain collectively with the union as the exclusive representative of all production and maintenance employees employed at petitioner's Milpitas, California plant, with exclusions not here material.

*Jurisdiction.* Petitioner is a California corporation engaged in the production and sale, at Milpitas, California, of concrete, mortar and plaster mixes, and the sale of an asphalt product. Employed at this plant are Philip V. Schneider, who, under the job title of executive secretary, has overall charge of the plant; Ray Freeman, whose job title is production superintendent; and a secretary, a truck driver, and two production and maintenance employees. The mixes are sacked and sold, under the trade name "Sakrete," to dealers in Northern California. Petitioner makes practically no out-of-state sales and it is conceded that its operations do not by themselves meet the Board's gross interstate inflow-outflow requirements for assertion of jurisdiction.

The "Sakrete" trademark is owned by Sakrete, Inc. (Sakrete), an Ohio corporation which, in addition to producing "Sakrete" products in the Cincinnati,

---

1. The decision and order was supplemental to an original decision and order reported in 137 N.L.R.B. 1220. In its original decision and order the Board rejected the trial examiner's original intermediate report (137 N.L.R.B. 1223) recommending dismissal of the complaint for jurisdictional reasons, asserted jurisdiction, and re-manded the case to the trial examiner for further proceedings.

2. On the basis of this finding petitioner was ordered to cease and desist from refusing to bargain with the union and, upon request, to bargain collectively and in good faith with the union.

Ohio area, licenses twenty-six other firms, including petitioner, to use the "Sakrete" trademark.[3] Sakrete owns no interest in any of the firms which it licenses. It is itself concededly subject to Board jurisdiction by reason of the nature and amount of its interstate operations.

The Board found and determined that petitioner's operations should be considered together with Sakrete's operations as a "single employer" for jurisdictional purposes and since Sakrete was subject to Board jurisdiction, so was petitioner.

The Board often treats separate corporations as one employer for jurisdictional purposes where it is found that the firms, despite their nominal separation, are highly integrated with respect to ownership and operation.[4] Petitioner apparently does not challenge the validity of the Board's "single-employer" concept and, in any event, that concept has been given effect by the courts. See A. M. Andrews Co. of Oregon v. N. L. R. B., 9 Cir., 236 F.2d 44.[5] Petitioner contends, however, that the facts of this case do not warrant the conclusion that petitioner and Sakrete are a single employer for jurisdictional purposes.

In the stipulation referred to earlier in this opinion, the parties agreed that the statement of fact set forth in the Board's original decision and order reported at 137 N.L.R.B. 1220, and in its supplemental decision and order reported at 140 N.L.R.B. 765, " * * * are assumed to be true, correct and supported by substantial evidence on the record as a whole." In its opening brief thereafter filed in this court, petitioner nevertheless attacks seven specific findings of fact pertinent to the jurisdictional question, made by the Board in its original report.[6] In view of the stipulation we will accept, as true and correct, the Board's findings of fact bearing upon the question of jurisdiction, as paraphrased below.

Throughout the period with which this case is concerned, Mr. and Mrs. Arthur C. Avril have owned the entire capital stock of Sakrete. Mr. Avril has functioned as the firm's president, Mrs. Avril as its vice president and treasurer, and George Riehl as its secretary. These officers also constitute the corporate board

---

3. By the terms of the license, petitioner agrees, among other things, to use the trade name in a specific territory, and Sakrete agrees to maintain the validity of the trade name and prevent its use by unauthorized persons.

4. A discussion of the early development of this Board principle, and of the principal factors which the Board weighs in deciding whether there is the requisite integration to constitute two corporations a "single employer," is set out in the 21st Annual Report of the Board, pages 14–15, where this statement appears:

"In applying the present jurisdictional standards, the Board early reaffirmed the long-established practice of treating separate concerns which are closely related as being a single employer for the purpose of determining whether to assert jurisdiction. The question in such cases is whether the enterprises are sufficiently integrated to consider the business of both together in applying the jurisdictional standards.

"The principal factors which the Board weighs in deciding whether sufficient integration exists include the extent of:

"1. Interrelation of operations;

"2. Centralized control of labor relations;

"3. Common management; and

"4. Common ownership or financial control.

"No one of these factors has been held to be controlling, but the Board opinions have stressed the first three factors, which go to show 'operational integration,' particularly centralized control of labor relations. The Board has declined in several cases to find integration merely upon the basis of common ownership or financial control." (Footnotes omitted.)

5. See, also, e. g., N. L. R. B. v. Elias Bros. Big Boy, Inc., 6 Cir., 325 F.2d 360; N. L. R. B. v. Royal Oak Tool & Mach. Co., 6 Cir., 320 F.2d 77, 80–81; N. L. R. B. v. Jones Sausage Co., 4 Cir., 257 F.2d 878, 879–880; N. L. R. B. v. A. K. Allen Co., 2 Cir., 252 F.2d 37, 38–40.

6. Petitioner begins its attack upon these findings with this introductory statement: "The Board's Finding of Facts (Vol. I, pp. 32 and 33) is a complete distortion of the relationship of the parties and unsupported by the evidence."

of directors. Mr. and Mrs. Avril likewise own all the capital stock of petitioner. Mr. Avril functions as its president, Mrs. Avril as its secretary-treasurer, and Joseph Orbangh as its vice president. These officers also constitute petitioner's corporate board of directors. Sakrete's officers and directors function in the same capacity for A. & T. Development Corporation, an Ohio corporation located in Cincinnati, which manufactures and sells the patented machinery used by "Sakrete" licensees.

Petitioner's and Sakrete's conduct of business operations are substantially parallel. Both sell the same products and use special patented equipment supplied by A. & T. Development Corporation. Petitioner, as licensee, must conform to quality standards set by Sakrete and may not sell any products not approved by that company. There is no regular interchange of employees between the two. Sakrete, however, possesses the right to dispatch a staff member or some qualified specialist employed by any licensee's firm, to petitioner's plant in order to check its operations, and in order to train or advise petitioner's personnel.

No central accounting system is employed, and no formal report is made by petitioner to Sakrete, respecting its expenditures and profits. But Avril admitted that, as president of petitioner, he presides at all of petitioner's business meetings, makes all major economic decisions, and keeps close watch over petitioner's overall operations. He is the ultimate authority for both companies, whose operating policies and procedures are thus almost identical.

Avril, as president of Sakrete, establishes all of that company's policies with regard to wage scales, hours and conditions of employment. He is also responsible for its sales, purchases of supplies, and its hire and discharge of employees. Avril establishes all the general rules with respect to wages, hours and conditions of work at petitioner's plant, and makes all major decisions with regard to contracts of purchase and sale.

While executive secretary Schneider has overall charge of petitioner's Milpitas plant and apparent authority to make local decisions, in practice the scope of his decisions has been very narrow. Avril admitted that, as president of respondent, the right of ultimate authority in all matters resides in him. In the exercise of this authority he has made decisions which were local in nature, such as hiring employees.

It was Avril who negotiated by telephone with his struck employees at Milpitas when the labor dispute developed which gave rise to this proceeding. On that occasion Avril stated that Schneider had acted outside his authority when he had "laid off" the employees who went out on strike. It therefore cannot be said that Avril does nothing more than set general policy for the Milpitas plant, or that Schneider exercises authority in regard to all local matters.

In summary, the facts show that the operations of petitioner and Sakrete are closely integrated, that their labor relations policies are almost identical and are centrally controlled, that the management of both resides virtually in one man, and that both are commonly owned and financially controlled.

Based upon these findings of fact the Board concluded that the two companies constitute a "single employer" for jurisdictional purposes.

In challenging this conclusion petitioner first argues that there is no substantial evidence in the record which supports a finding of interrelationship of operations, centralized control of labor relations, or common management except at the executive or top level. Petitioner contends that there must be interrelationship, centralized control and common management at the local level in order to apply the "single employer" concept.

It is doubtful whether petitioner is in a position to argue that there was no interrelationship, centralized control and common management on the local level, for this would appear to constitute an attack upon findings which it has stipulat-

ed are " * * * true, correct and supported by substantial evidence on the record as a whole." The Board, as indicated above, found that the local manager's authority was limited and that Avril has made decisions which were local in nature pertaining to the hiring and laying off of employees and negotiations with employees on strike. In its findings, the Board expressly stated: " * * we cannot agree that Avril does nothing more than set general policy for the Milpitas plant, or that Schneider exercises authority in regard to all local matters." [7]

■■ But, assuming that it is now open to petitioner to attack these findings, they are in any event supported by substantial evidence. Moreover, even if the substantial evidence shows interrelationship of operations, centralized control of labor relations, or common management only at the executive or top level, we do not agree that this precludes application of the "single employer" concept.

Petitioner bases its argument that there must be mutuality of control of the two companies on the local level on the hypothesis that mutuality of control at the executive level is concomitant with common ownership of financial control, one of the four criteria applied by the Board in determining whether two companies should be regarded as a single employer. See note 4. It follows from this, petitioner asserts, that the three other criteria applied by the Board, relating to centralized control of labor relations, common management, and interrelation of operations, must pertain to normal or current business operations at the local level.

■ But while the power to control on all levels may be a concomitant of common ownership or financial control, and so embraced within that particular Board criterion, the actual exercise of that power is not. The three other criteria deal not with power and authority, as such, but with its exercise. Thus interrelationship of operations, centralized control of labor relations, and common management, on any level, are considerations in addition to the factor of common ownership or financial control.

■ Apart from the argument, which we reject, that the Board's criterion contemplates interrelationship, centralized control and common management at the local level if two companies are to be regarded as a "single employer," no other reason is suggested or occurs to us why mutuality of control at the local level must be shown. Seldom would it be practicable for two companies situated in different parts of the country to be managed at the local level by one man or management group. If there is overall control of critical matters at the policy level, the fact that there are variances in local management decisions will not defeat application of the "single employer" principle.

As its second argument against the Board's conclusion that petitioner and Sakrete constitute a "single employer" for jurisdictional purposes, petitioner calls attention to the decision of this court in N. L. R. B. v. Santa Cruz Fruit Packing Co., 9 Cir., 91 F.2d 790, aff'd 303 U.S. 453, 58 S.Ct. 656, 82 L.Ed. 954.

The Santa Cruz case, decided in 1937, did not involve the "single employer" problem, and it is doubtful whether that concept had yet been thought of.[8] The decision of this court in Santa Cruz, insofar as here pertinent, stands for the proposition that where the Board's jurisdiction rests not on the interstate activities of an employer, but upon the effect its intrastate activities have upon interstate commerce, only those plants of the employer which have such an effect upon interstate commerce will be deemed subject to Board jurisdiction. The Oakland plant of the Santa Cruz Fruit Packing

---

7. Petitioner asserts that the stipulation, read as a whole, indicates that the parties did not reach agreement on the facts referred to above. The Board apparently does not share this view.

8. See 21st Annual Report of the Board, pages 14–15, giving the background of the "single employer" theory, but citing no case earlier than 1948.

Co. was held to have such an effect, and the Seabright plant was held not to. Thus the Board was found to have jurisdiction over the Oakland plant but not the one at Seabright. No such jurisdictional problem being involved in our case, we need not consider whether the Santa Cruz case was correctly decided.[9]

We hold that the Board did not err in asserting jurisdiction over petitioner.

*Refusal to bargain.* The Board found that the petitioner, among other things, had violated section 8(a) (5) and (1) of the Act by refusing to bargain with the union. Petitioner does not deny that it refused to bargain, but argues that under the particular facts of this case, it was entitled to refuse to do so.

The pertinent facts are that all four of petitioner's employees—two plant workers, a truck driver, and the production supervisor, Freeman, signed authorization cards with the union. The union's representative approached Schneider and proposed that petitioner enter a collective bargaining agreement covering all four workers. Schneider apparently knew that the proposed unit included the three workers and the supervisor, Freeman, but he did not specify that the reason for refusing to bargain was that the supervisor was included in the group.[10] Nevertheless, petitioner argued before the Board and argues now that he was entitled to refuse to bargain since the proposed bargaining unit was inappropriate.

■ It is true that under section 14 of the Act, 29 U.S.C. § 164(a) (1958) petitioner was entitled to refuse to treat his supervisor as an employee covered by the Act. But this does not preclude the petitioner and the union from entering into an agreement covering the supervisor if they choose to do so. Cf. N. L. R. B. v. News Syndicate Co., 365 U.S. 695, 81 S.Ct. 849, 6 L.Ed.2d 29. Accordingly, the union committed no unfair or unlawful act in proposing that the supervisor be covered by the proposed collective bargaining agreement.

■ Petitioner's course of action was to object to the inclusion of Freeman in the bargaining unit, not to refuse to bargain altogether.[11] Of course, if the exclusion of Freeman from the unit had resulted in the union's failure to have a majority in the remaining unit, petitioner would have been entitled to refuse to bargain. Home Stores, Inc., 87 N.L.R.B. 335. But here the exclusion of Freeman from the unit did not affect the union's majority in the remaining unit; as to them the union continued to have unanimous support.

A refusal to bargain under these circumstances constitutes an unfair labor practice. N. L. R. B. v. National Motor Bearing Co., 9 Cir., 105 F.2d 652, 660; N. L. R. B. v. Philamon Laboratories, Inc., 2 Cir., 298 F.2d 176, 179–180. Since petitioner has stated no reason why he should not have been required to bargain with the union, the Board did not err in finding that there was a refusal to bargain.

■ *The order to bargain.* Petitioner questions a remedial provision of the Board order which directs it to bargain with the union. The facts are that petitioner's four employees went on strike on

9. The employer, but not the Board, appealed to the Supreme Court from our decision in Santa Cruz. It follows that the correctness of our decision as to the lack of Board jurisdiction over the Seabright plant was not before the Supreme Court.

10. This failure to specify the reason for refusing to bargain lends support to the Board's argument that the original refusal to bargain was motivated by petitioner's anti-union sentiments, and that the issue raised here was merely an afterthought which played no part in the original re-fusal to bargain. See N. L. R. B. v. Clearfield Cheese Co., 3 Cir., 213 F.2d 70, 74.

11. Although we are of the view that the union's proposal to include Freeman in the bargaining unit was not illegal, petitioner's refusal to bargain is not excused even if the union had made an illegal proposal in its bargaining demands. N. L. R. B. v. Sunrise Lumber & Trim Corp., 2 Cir., 241 F.2d 620; N. L. R. B. v. White Const. & Engineering Co., 5 Cir., 204 F. 2d 950.

August 16, 1961, and were discharged later that day. They were offered reinstatement by petitioner at a later date, but they all refused the offer. Petitioner now argues that because none of the employees who belonged to the union are now employed or have any interest in being employed by petitioner, the Board ought not to require the petitioner to continue to bargain with the union.

We think that this issue is controlled by our decision in N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 134. There we held that the Board could order an employer to bargain with a union even though none of the union members were employed at the time of the Board order. This is consistent with the principle that

> " * * * an employer may not set up as a justification for its refusal to bargain with a union the defection of union members which it had itself induced by unfair labor practices, even though the consequence is that the union no longer has the support of a majority. In such circumstances the employer will be required to bargain notwithstanding the union does not presently have a majority." N. L. R. B. v. Idaho Egg Producers, Inc., 9 Cir., 229 F.2d 821, 823.

Petitioner argues, however, that the Board is required to consider the effect of the unfair labor practices on the change of union membership, and find that such labor practices did in fact effect a change, before it can order petitioner to bargain with the union. In this particular case, argues petitioner, the Board failed to make these required findings.

We find no support for petitioner's argument. The Supreme Court has held that the Board has wide discretion "to determine how the effect of prior unfair labor practices may be expunged." International Ass'n of Machinists Tool and Die Makers Lodge No. 35 v. N. L. R. B., 311 U.S. 72, 82, 61 S.Ct. 83, 89, 85 L.Ed. 50. Consistent with this position, the Su-

preme Court has allowed the Board to order employers to bargain collectively with unions which have lost their majority status after the employer had wrongfully refused to bargain with it, even though there was no finding that the loss of majority was directly caused by the refusal to bargain itself. Franks Bros. Co. v. N. L. R. B., 321 U.S. 702, 64 S.Ct. 817, 88 L.Ed. 1020; N. L. R. B. v. P. Lorillard Co., 314 U.S. 512, 62 S.Ct. 397, 86 L.Ed. 380. The Court's opinion in Franks Bros., supra, 321 U.S. at 706, 64 S.Ct. 817, 88 L.Ed. 1020, makes it clear that N. L. R. B. v. Fansteel Metallurgical Corp., 306 U.S. 240, 59 S.Ct. 490, 83 L.Ed. 627, cited by petitioner, is not inconsistent with this position.[12]

As we said in N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 135, the Board may grant this kind of order without making a finding that the loss of membership resulted from unfair labor practices, since,

> " * * * it is reasonable to assume that in the presence of unfair practices a decline in employee support does not reflect an untrammeled expression of the employees' will, and that the unfair practices must be purged before the representation question can be accurately determined."

The petitioner further argues that since its present employees have no interest in the union, they should be given a right to a representation of their own choosing and not to have one foisted upon them by the Board. No injustice is done petitioner's employees, however, in view of the fact that the Board's order does not establish the union as the employees' permanent representative. Franks Bros. Co. v. N. L. R. B., 321 U.S. at 705, 64 S.Ct. 817, 88 L.Ed. 1020. After the union has had a reasonable time in which to establish itself, petitioner's employees will have a procedure whereby they can establish that they prefer representation other than that of the union. Superior

---

12. See also, N. L. R. B. v. Andrew Jergens Co., 9 Cir., 175 F.2d 130, 135, and cases cited therein on this point.

Engraving Co. v. N.L.R.B., 7 Cir., 183 F.2d 783, 794.[13]

The Board did not err in ordering petitioner to bargain collectively in good faith with the union.

In its answer to the petition for review, the Board has requested enforcement of its order. For the reasons stated, the Board order is affirmed and a decree will issue enforcing it.

13. See, National Labor Relations Act § 9 (c) (1) (A) (ii), as amended, 61 Stat. 143 (1947), 29 U.S.C. § 159(c) (1) (A) (ii) (1958).