**L. E. DAVIS, d/b/a Holiday Inn of Benton, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**Kent HORTIN and Peggy Hortin, d/b/a K–P Associates, Respondents,**

**L. E. Davis, d/b/a Holiday Inn of Benton, Intervenor.**

Nos. 78–2136, 78–2518.

United States Court of Appeals, Seventh Circuit.

Argued Sept. 24, 1979.

Decided March 19, 1980.

Catherine Garcia, N.L.R.B., Washington, D. C., for respondent, cross-petitioner.

Ross A. Friedman, St. Louis, Mo., for petitioner, intervening-respondent, L. E. Davis.

Before SWYGERT, PELL and BAUER, Circuit Judges.

SWYGERT, Circuit Judge.

This case is before us on a petition to review an unfair labor practice order of the National Labor Relations Board. The Board cross-applied for enforcement of the order. We grant enforcement insofar as the order determines the conversion of a full-service restaurant to a self-service cafeteria without notifying or bargaining with the local union to have been an unfair labor practice, but we otherwise deny enforcement.

I

Petitioner L. E. Davis operates the Holiday Inn motel in Benton, Illinois, pursuant to a franchise agreement with Holiday Inns, Inc. Davis also operated the restaurant located at the Inn. That facility provides the setting for the activities from which the Board's order arose. Until September 18, 1976, the restaurant was a full-service place of eating, including table service provided by six waitresses. Faced with declining food sales, Davis closed the restaurant on that date, planning to convert the facility to a self-service cafeteria. He hoped that by revamping the restaurant it would provide faster service to its customers, give greater food selection, and allow the Inn to compete with local fast food operators. As a result of the shutdown, the kitchen and dining room employees were laid off. Davis did not notify them or their union[1] of the plan to convert the restaurant. During the next five days dispensing equipment was installed and minor structural modifications were made. On September 24 the facility reopened as a self-service cafeteria. The kitchen employees were immediately recalled and the waitresses were formally notified of their layoff. In October, the cafeteria-style operation was modified for service of the evening meal. The buffet service was terminated and in its place customers, after looking at a menu, gave their orders to the kitchen employees at the buffet table. The customers returned to the buffet table to pick up their food following its preparation. No services were provided to the patrons at their tables. Thus no waitresses were employed by Davis.

1. Hotel and Restaurant Employees and Bartenders Union, Local 258.

Frustrated by a continued decline in sales, Davis in November 1976 decided to lease the restaurant operation. He discussed the situation with Kent Hortin, who stated that he and his wife, Peggy, would be interested in assuming the lease of the operation. Davis approved of the idea. At the time of the discussion, Hortin was employed as the "Innkeeper" at the Holiday Inn in Benton.[2] As such, he was responsible to Davis for the proper management and efficient operation both of the motel and of the restaurant. In preparing for the take-over of the operation on January 3, 1977, the following occurred. Hortin met with a union official, at which time he notified the union of his desire to retain the collective bargaining agreement. However, Hortin also stated that he would not hire layoff status employees or retain certain employees on the jobs. Since the hiring of new employees ahead of employees in layoff status violated the agreement, the union objected to Hortin's plan. Thereafter, Hortin revoked his offer to assume the contract, and on December 20 he requested bargaining for a new agreement. The union refused to set a date for starting negotiations. In the meantime, Hortin received a $7,000 loan from his parents for operating capital, and he and his wife formed the partnership of K–P Associates for the purpose of leasing and operating the restaurant. They then interviewed applicants, and on December 23 they hired a number of new restaurant employees. Two days later Hortin informed the union of his plan to take over the restaurant on January 3, in addition to providing the names of the employees whom K–P Associates had hired. On December 31 Davis notified his employees that they were terminated because of a change in ownership. Several of the kitchen personnel who were working at the restaurant prior to the assumption of the lease were offered employment by K–P Associates.

On January 3, 1977 the Holiday Inn restaurant reopened as a full-service facility.

Though changes in the uniforms and the menu were initiated by the Hortins and the restaurant was redecorated to some degree, the operation was similar to that which existed prior to the change-over from a restaurant with waitress service to the self-service operation. According to the terms of the one-year lease, Hortin was required to pay Davis $1,200 a month or ten percent of the gross sales, whichever was greater.

In February 1977, a consolidated complaint was issued by the Board, alleging that Davis violated sections 8(a)(1), (3), (4), and (5) of the Act. It further alleged that the Hortins, acting as the *alter ego* of, or jointly with, Davis violated sections 8(a)(1), (3), and (5).

The Board, in disagreement with the Administrative Law Judge, held that the conversion of the restaurant to a self-service cafeteria effected a change in "the terms and conditions of employment" of the restaurant employees and, as such, Davis violated section 8(a)(5) of the Act for failing to notify the union of the contemplated change in operations and to provide it with the opportunity to bargain over the decision and its effects.

Also contrary to the findings of the Administrative Law Judge, the Board held, with Chairman Fanning in dissent, that as a result of the lease arrangement, K–P Associates and Davis were joint employers and, as such, both violated sections 8(a)(3), (5), and (1) of the Act by failing to offer employment to those employees who were either employed or in layoff status prior to January 3, when the Hortins assumed the lease. The Board additionally found that K–P Associates was required to honor the preexisting bargaining agreement between the union and Davis and therefore was obligated to recall laid off employees before hiring new applicants to staff the restaurant.

The Board ordered both parties to cease and desist from the foregoing unfair labor practices and interfering in any manner

**2.** According to the franchise agreement between Holiday Inns, Inc. and Davis, Davis was required to employ an Innkeeper who was a graduate of the Holiday Inn University. Hortin was selected to fill that position.

with the employees in the exercise of their rights under the Act. Affirmatively, the order requires Davis and the Hortins to make the waitresses and kitchen employees whole for any earnings they would have received had the restaurant remained a full-service facility after September 19, 1976. They are further required to offer all restaurant employees who had been discharged immediate reinstatement to their former positions, or equivalent ones if they no longer exist, and the employees are to be made whole for any lost earnings as a result of the December 31, 1976 terminations and subsequent refusals to rehire.[3]

## II

The primary question presented by this petition to review the Board's order is whether an employer's economically motivated decision to close a full-service restaurant and to reopen the facility five days later as a self-service cafeteria is a subject of mandatory collective bargaining within the statutory phrase "terms and conditions of employment."[4] Davis' position is that the conversion of a full-service restaurant to a cafeteria-style facility is similar to a partial closing or the elimination of one phase of a business and, in accordance with the holdings of several circuits, such an operational change in the business is not a mandatory subject of bargaining. Relying on *Fibreboard Paper Products v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964), the Board maintains that Davis had a duty to bargain with the union both about his decision to modify the restaurant operation

and layoff waitress personnel and the effects of the decision.

In resolving the issue, we begin with the principles enunciated in *Fibreboard Paper Products, supra.* There the Supreme Court held it was a refusal to bargain in violation of section 8(a)(5) of the Act when the employer, in an attempt to cut labor costs, subcontracted the work his employees had previously performed without first negotiating with the collective bargaining unit. In reaching its conclusion, the Court relied on three grounds. First, it found that a decision to contract out unit work "fell well within the literal meaning" of the statutory phrase "terms and conditions of employment." *Id.* at 210, 85 S.Ct. at 403. Next, it noted that the issue of subcontracting was "peculiarly suitable for resolution within the collective bargaining framework." *Id.* at 211–14, 85 S.Ct. at 404. (Support for this observation was evidence that many collective bargaining contracts include a clause covering such an event.) Finally, the Court focused on the fact that the subcontracting did not entail "capital investment" or "significantly abridge [the employer's] freedom to manage the business." *Id.* at 213, 85 S.Ct. at 404. In his concurrence, Mr. Justice Stewart discussed this last factor in detail:

An enterprise may decide to invest in labor-saving machinery. Another may resolve to liquidate its assets and go out of business. Nothing the Court holds today should be understood as imposing a duty to bargain collectively regarding such managerial decisions, which lie at

---

3. The Board's decision and order appears at 237 N.L.R.B. 157.

4. The duty of unions and management to bargain under section 8(a)(5) of the Act is defined by section 8(d) as the obligation to meet at reasonable times and confer in good faith with respect to wages, hours, and "other terms and conditions of employment." The pertinent provisions of the National Labor Relations Act are:

Sec. 8(a) It shall be an unfair labor practice for an employer—
* * * * * *
(5) to refuse to bargain collectively, with the representatives of his employees, subject to the provisions of section 9(a).

* * * * * *

Sec. 8(d) For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and the representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession . . . . .

the core of entrepreneurial control. Decisions concerning the commitment of investment capital and the basic scope of the enterprise are not in themselves primarily about conditions of employment, though the effect of the decision may be necessarily to terminate employment. *Fibreboard Paper Products, supra,* 379 U.S. at 223, 85 S.Ct. at 409–10.

After *Fibreboard,* the Board and several circuits have trodden one or the other of two distinct paths in deciding whether an employer has the duty to bargain about an economically motivated managerial decision to terminate all or part of a bargaining unit's work. A thorough discussion of these separate journeys is contained in *Brockway Motor Trucks v. NLRB,* 582 F.2d 720, 727–31 (3d Cir. 1978); we need not retrace those steps. In summary, the traditional position of the Board has been that in all circumstances, except where an employer has decided "to eliminate itself as an employer," or completely shuts down a "discrete line of business," the decision to terminate a portion of the business is a subject of mandatory bargaining. *See Ozark Trailers, Inc.,* 161 N.L.R.B. 561 (1966); *Summit Tooling Co.,* 195 N.L.R.B. 479 (1972); *Duty to Bargain About Termination of Operations: Brockway Motor Trucks v. NLRB,* 92 Harv.L.Rev. 768, 773 (1979). Among several courts of appeals, the view is shared that absent anti-union animus on the part of an employer, decisions involving "basic operational changes" in the nature of the employer's business or "investment or withdrawal of capital" fall outside the scope of mandatory collective bargaining. *See, e. g., International Ass'n of Machinists v. Northeast Airlines, Inc.,* 473 F.2d 549 (1st Cir.) *cert. denied,* 409 U.S. 845, 93 S.Ct. 48, 34 L.Ed.2d 85 (1972) (no duty to bargain over a merger which lies at the core of "entrepreneurial control"); *NLRB v. Acme Industrial Products,* 439 F.2d 40 (6th Cir. 1971) (decision to relocate part of employer's manufacturing operations to another plant was not a mandatory bargaining subject); *NLRB v. Dixie*

*Ohio Express Co.,* 409 F.2d 10 (6th Cir. 1969) (*per curiam*) ("streamlining" operation entailing partial termination of plant operation held non-mandatory). *But see Brockway Motor Trucks, supra,* 582 F.2d at 735 (holding there is "an initial presumption, founded on statutory purposes and language, that a partial closing is a mandatory subject of bargaining").

In light of these differing views, it is understandable why Davis is eager to characterize his change in operation as a partial closing or a relocation.[5] According to Davis, the conversion of the restaurant was a change in the basic operation of the business required by economic necessity and therefore, he was not obligated under the Act to bargain with the union about the decision. The facts in this case, however, are not that simple. Unlike those in *Fibreboard,* they do not depict a true "contracting out" situation where displaced employees are substituted for by non-unit workers. Nor do they fit into the model Davis suggests. This is not the case where an employer has exercised his managerial prerogative to terminate, relocate, liquidate, or sell his business or a part of it.

Although the Supreme Court's holding in *Fibreboard* was limited to subcontracting work previously performed by bargaining unit employees, the considerations set forth in that decision control here. At the outset, it is apparent that the closing of the full-service restaurant and the reopening of a self-service cafeteria is a "condition of employment" for purposes of the Act because such a decision leads to the termination of at least some employees. *See Fibreboard, supra,* 379 U.S. at 210, 85 S.Ct. at 402; *Brockway Motor Trucks, supra,* 582 F.2d at 735 (holding that closing down of an employer's plant falls within statutory phrase "terms and conditions of employment").

Second, bargaining over such a change in operation would promote a basic purpose of the Act—to encourage the peaceful settle-

---

**5.** A "partial closing" is a closing of one facility by an employer having at least two plants. A "relocation" is a shutdown of one of two or more facilities and then a relocation. *Brockway Motor Trucks, supra,* 582 F.2d at 724 n. 10.

ment by the parties themselves of labor disputes. On this, we agree with the Third Circuit's statement in *Brockway Motor Trucks, supra,* regarding the duty to bargain over a partial closing:

> In the abstract, the aims of collective bargaining would be furthered by requiring an employer to negotiate with a union before deciding irrevocably to close down a plant. Such a requirement would lead to some discussion—however brief it may be—between the parties, and would allow them in advance of a *fait accompli* by one or the other to comprehend the factors motivating each of them. It would at least help foster respect for the role of each side as a subject in the controversy, and not as a mere object to be treated in accordance with the other's will.

*Id.* at 734–35. Furthermore, the Board in recalling the practical considerations examined by the Court in *Fibreboard* found that Davis' decision to convert his operation to a self-service cafeteria was related, in part, to the costs of labor. It thus appears that the union and Davis could have engaged in fruitful discussion about the decision. Specifically, the Board stated:

> Evidence indicates that at least part of the reason for Davis' decision to convert was his observation that, due to declining revenues, labor costs were increasing relatively. To this extent, it is apparent that Davis' concern over the effects of such labor costs on his enterprise is a "matter peculiarly suitable for resolution within the collective bargaining framework."

237 N.L.R.B. 157, pp. 5–6, *citing Fibreboard, supra,* 379 U.S. at 213, 214, 85 S.Ct. at 404. We find substantial evidence for this finding.

Following the *Fibreboard* approach, the third step to consider is how the peculiar facts of this case bear on determining whether the conversion plan involved "capital investment" or altered the "basic operation" of the restaurant, whereby Davis' freedom to run his business would significantly be abridged if required to bargain over such a decision. *Fibreboard, supra,* 379 U.S. at 213, 85 S.Ct. at 404. On this point, the Board found:

> While some new equipment was installed as a result of the conversion to a cafeteria operation, the record does not reflect that this new equipment constituted a major reinvestment of capital. Moreover, it is clear that the conversion resulted in the customers doing work which had previously been performed by waitresses. We therefore conclude, as did the Court in *Fibreboard,* that requiring the Employer to bargain about the matter would not significantly abridge the employer's freedom to manage the business.

237 N.L.R.B. 157, p. 5. We find substantial evidence in the record as a whole to support the Board's finding. Davis operated the cafeteria in the same location during the same hours, and he offered the same menu to the public. No major capital investment or disinvestment was undertaken in converting the restaurant to a cafeteria. Davis' sole purchase was trays for the use by customers in carrying their food and silverware from the buffet counter to their tables. The food itself was not prepared in a manner different from before. Additionally, no major remodeling was undertaken; the only evidence on this point is that a piece of equipment called a "cook out" was removed along with some bricks. In light of the foregoing facts, it is apparent that the underlying nature of the business was not altered. The only real difference between the restaurant and the cafeteria operations is that in the latter situation waitresses were no longer taking orders and carrying food trays. The carrying of trays still had to be done at the restaurant and Davis merely replaced the waitresses with customers who did that task. Therefore it follows from the *Fibreboard* teachings that requiring Davis to bargain about the conversion would not "significantly abridge" his freedom to manage the business.

Lastly, we consider the interest of the employees. The Board found:

[T]he employees' interest in bargaining over such plans to convert from a restaurant to a self-service cafeteria is clear. Such a change resulted in a radical alteration of the employment status of the entire staff of waitresses.

237 N.L.R.B. 157, pp. 5–6, *citing Fibreboard, supra*, 379 U.S. at 213, 214, 85 S.Ct. at 404. This finding is supported by substantial evidence in the record.

We therefore conclude that the conversion of the restaurant to the cafeteria was a mandatory bargaining subject. Though Davis had the right to determine the need for a modification of his operation along cost-saving lines, the Act obligated him to notify the union of the planned conversion, thereby affording the union an opportunity to negotiate concerning the plan itself, the manner and timing of its implementation, and the effect of the conversion on those employees whose jobs were to be eliminated. The record shows no evidence that Davis was faced with a situation so severe and immediate that bargaining about the decision to convert the restaurant would have been fruitless. Rather, the evidence shows that the restaurant experienced losses since the beginning of 1976 and for several months Davis had been contemplating changes in his operation, which included the hiring of Bill Turpin as restaurant manager for a two-month period from July to September. In September Davis, moreover, told an international organizer for the union that because the business had been declining so badly, "we were going to have to make some sort of a change and that in the change, we possibly would have to lay off some people." Furthermore, there is no showing here that bargaining would have substantially impaired effective negotiations with a third party. *Brockway Motor Trucks, supra*, 582 F.2d at 738–39. In light of these circumstances, there was room for negotiations with the union.

In attacking the Board's finding that he violated section 8(a)(5), Davis makes a varie-ty of arguments. One of his contentions is that the *Fibreboard* decision, as a result of subsequent interpretations, is applicable only to "contracting out" cases. This argument is unpersuasive. *Brockway Motor Trucks, supra*, a recent decision by the Third Circuit, concerned an employer's obligation to bargain about its decision to close one of its plants for economic reasons. There the court, holding that a partial closing may be a mandatory subject of collective bargaining, studiously followed the analytical approach of the Supreme Court in *Fibreboard.*[6] Additionally, Davis' attempt to circumvent the requirements of section 8(d) by arguing that the conversion was a partial closing (which need not be bargained about according to some circuits' decisions) is severely undercut by *Brockway Motor Trucks, supra*. In discussing the scope of an employer's duty to bargain, the court said that "there seems to be no justification for drawing any bright line between a partial closing situation . . . and the subcontracting [issue] of *Fibreboard* . . . . With regard to both matters, bargaining would serve an important statutory function." *Brockway Motor Trucks, supra*, 582 F.2d at 735.

Lastly, Davis argues that the decision in *NLRB v. Vegas Vic, Inc., d/b/a Pioneer Club*, 213 N.L.R.B. 841 (1974), *aff'd*, 546 F.2d 828 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 (1977), requires us to overrule the Board. *Vegas Vic*, however, is distinguishable. There it was held that the Act does not require an employer to bargain with the union in advance over the decision to convert a "sit down" bar to a "service" bar because such a change in method of operation was exclusively a management decision. The distinguishing fact between these two cases is that in *Vegas Vic* the Board found that the change required a "considerable capital expenditure" for installing a new bar in a different part of the premises. 213 N.L.R.B. 841, p. 6. Here, on the other hand, the record fails to show that Davis made a

---

6. The Third Circuit, however, declined to enforce the Board's order requiring Brockway to bargain because the exact nature of the condi-tions leading to Brockway's decision to close one of its plants was not known. *Brockway Motor Trucks, supra*, 582 F.2d at 739.

substantial capital investment in order to change the restaurant to a cafeteria.

### III

The Administrative Law Judge concluded that Davis and K–P Associates were not joint employers of the restaurant employees because Davis, after the Hortins assumed the lease, neither possessed a financial stake in the restaurant nor joint control over the labor relations policy of the restaurant. Accordingly, the Administrative Law Judge recommended that the complaint be dismissed as to the Hortins for failure to meet the Board's retail jurisdictional requirement. Focusing on Hortin's position as Innkeeper, the Board disagreed. Specifically, it found that Kent Hortin and Davis "while nominally engaged in separate enterprises, had in fact entertwined the two operations to a degree sufficient to warrant a finding that they functioned as a joint employer." It concluded, therefore, that the Hortins, having failed to offer jobs to the restaurant employees who had worked for Davis prior to the execution of the lease, violated sections 8(a)(3) and (5) of the Act. The Board also found that K–P Associates was obligated to honor the preexisting bargaining agreement entered into by the union and Davis, and in failing to do so, had violated section 8(a)(5).

"The NLRB has long held that if two or more employers exert significant control over the same employees, they constitute 'joint employers' under the NLRA." *Lutheran Welfare Services of Illinois and United Christian Community Services v. NLRB*, 607 F.2d 777, 778 (7th Cir. 1979). In such cases, the Board considers four criteria in determining joint employer status: (1) centralized control of labor relations, (2) common management, (3) common ownership, and (4) interrelation of operations. *Sakrete of Northern California, Inc.*, 137 N.L.R.B. 1220, aff'd, 332 F.2d 902 (9th Cir. 1964), *cert. denied*, 379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965).

Both Davis and the Hortins contend that the Board erred in finding a joint employer situation here because the facts do not show that Hortin possessed the requisite control over the labor relations policies of Davis in his operation of the motel. Moreover, it is argued that there is no evidence that Davis had control, actual or potential, over the labor policies of the restaurant. In response, the Board contends that the substantial labor relations authority simultaneously exercised both in the restaurant and in the motel by "one powerful manager"—Hortin—supports the Board's conclusion of joint employer status.

The Board's determination that K–P Associates and Davis functioned as joint employers is essentially factual and should be sustained if "substantial evidence in the record supports the Board's finding." *NLRB v. Sure-Tan, Inc.*, 583 F.2d 355, 358 (7th Cir. 1978). *See also Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Having examined the record, we hold that the facts do not support the Board's findings on this issue. We reach this conclusion by analyzing the record from the standpoint of the criteria set forth in *Sakrete, supra*.

### A. *Centralized Control of Labor Relations*

The Board insists that substantial evidence of centralized control of labor relations exists on the basis of the two roles played by Kent Hortin—motel Innkeeper and restaurant operator. According to the Board's theory, Hortin made the policy decisions regarding labor relations both for himself and for Davis. The record shows, however, that Hortin's authority to dictate the motel's labor policies was more limited than what the Board suggests. At the hearing held before the Administrative Law Judge, Hortin testified that primary responsibility for hiring, scheduling, training, and disciplining the employees working at the motel rested with the various supervisors, including the Inn's housekeeper, and that he did not possess the absolute authority to fire employees. Though Hortin participated in the contract negotiations between Davis and the union, and signed the agreement on behalf of Davis, there is no evidence that he made any decisions regard-

ing the motel's policy. Hortin, moreover, was required to turn all grievances filed by employees under the union contract over to Davis for his determination as to what action to take. In light of this evidence, we believe that Hortin was a salaried employee, who worked at the pleasure of Davis and whose authority was subject to the restrictions placed upon it by Davis. Though energetic in fulfilling his Innkeeper's tasks, he was devoid of the authority to mold labor policy.

In regard to the labor policies of the restaurant after the assumption of the lease, Hortin and his wife formulated the company policy to suit their own interests. The record further shows that Davis asserted no control over labor relations at the restaurant and he was not empowered to do so under the terms of the lease. All restaurant employees were interviewed by the Hortins, with the exception of the few kitchen employees who previously worked for Davis and were offered jobs by Hortin. Decisions as to who would be hired, what wages to pay the employees, what benefits they were entitled to, and what hours the employees would work were all made by the Hortins. Additionally, Mrs. Hortin supervised the employees on a daily basis.

## B. *Common Management*

The Board found that "Hortin was more than minimally involved in the management of Davis' franchise operation." To support this conclusion, the Board relied in part on evidence of Hortin's involvement in the restaurant prior to the lease arrangement—which included his involvement in arranging fashion shows at the restaurant, placing ads in local newspapers as requested by Davis, and discussing with Davis methods by which restaurant sales could be increased. This evidence, however, is based on Hortin's activities prior to K–P Associates' assumption of the lease when two separate employers did not exist.[7] Examining the activities of the parties after the execution of the lease, the record shows the following.

The management staff of the motel included Davis, Hortin, and Melinda Roberts, who was responsible for the day-to-day supervision of the housekeeping employees. The restaurant, on the other hand, was managed exclusively by the Hortins. Though the record is clear that Innkeeper Hortin directed the motel employees' work (he testified that he possessed general overall responsibility for proper management and efficient operation of the motel), there is no evidence that motel employees reported to the restaurant for work assignments. There is no evidence, moreover, that Davis participated in the hiring and firing of the restaurant's employees.

## C. *Common Ownership*

The record shows an absence of common ownership here. K–P Associates is a partnership consisting of Kent Hortin and Peggy Hortin; Davis has never been a partner in their business. Additionally, the Hortins possess no financial interest in the motel franchise.

## D. *Interrelations of Operations*

The record supports, and the parties do not dispute, a finding of interrelationship of operations between the motel and restaurant. The ventures operated at a common situs, they were held out to the public as part of the Holiday Inn franchise chain, and provided services for many of the same patrons. The presence of this factor, however, is insufficient to overcome the lack of substantial evidence as to the other criteria. *Cf. Cincinnati S. I. Co., a Limited Partnership, d/b/a Stouffer's Cincinnati Inn,* 225 N.L.R.B. 1196 (1976). Joint employer status ultimately depends on "all the circumstances of the case" and is characterized as "an absence of an 'arm's length relationship found among unintegrated companies'," *NLRB v. Don Burgess Construction Corp.,* 596 F.2d 378, 384 (9th Cir. 1979) *cert. denied,* —— U.S. ——, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). (citations omitted). On the basis of the record as a whole, the

---

7. On appeal the Board does not suggest that K–P Associates was the alter ego of Davis.

Board erred in concluding that the Hortins and Davis were joint employers.

We deny enforcement of the Board's order against K–P Associates in all parts. The order against Davis for violating section 8a(5) of the Act is enforced. Accordingly, the Board's remedy is amended so that Davis alone is required to make the restaurant employees whole for any earnings they would have received had the facility remained a full-service restaurant from September 19, 1976 until January 3, 1977.

PELL, Circuit Judge, concurring in part and dissenting in part.

While I agree with and concur in the majority opinion's disposition set forth in Part III of the opinion, I am unable to do likewise as to Part II as it appears to me that the result reached by the Board and approved by the majority opinion imposes a duty to bargain on a managerial decision lying at the core of entrepreneurial control. This result is contrary not only to most court decisions in similar situations but is indeed contrary to the Board's decisions in the area. The Board has not purported to change positions on the matter but has attempted to distinguish its own opinions, an effort which I regard as not having been crowned with success in the present case. Accordingly, I respectfully dissent.

At the outset two matters should be noted which should have a bearing on the disposition of this case. First of all, the Board in its order agreed with the Administrative Law Judge (ALJ) that there was insufficient evidence that the conversion of the restaurant to a self-service cafeteria was discriminatorily motivated. Likewise, the Board did not disagree with the ALJ's finding that the conversion was based solely on economic considerations. A second matter is that the duty to bargain in a situation of the sort here involved has two aspects. First, there is the question of whether the employer must give the union prior notification of the contemplated change and bargain with the union prior to making the change. Secondly, even if the change was properly made pursuant to the inherent freedom of an employer to manage his business, the question remains of whether subsequent to the change there was a duty to bargain with the union about the effects of the decision. While I will discuss the second aspect further hereinafter, I note at this point that Davis concedes that he was obligated under existing law to bargain *on demand* over the effects of the conversion.

As seems to be frequently the case in litigation involving the present issue, both parties relied to some extent upon *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 85 S.Ct. 398, 13 L.Ed.2d 233 (1964). In any event, that case should be the beginning point of our inquiry and the case properly, as has been pointed out in subsequent cases, must be read in the light of the concurring opinion by Justice Stewart. The majority opinion in *Fibreboard* did indicate that not all actions leading to termination were mandatory subjects of bargaining, but this was made clearer in the concurring opinion, the emphasis of which, as it appears to me, was that the Court was not holding that actions resulting in termination are *per se* a mandatory subject of bargaining. Thus, Justice Stewart stated, "The Court most assuredly does not decide that every managerial decision which necessarily terminates an individual's employment is subject to the duty to bargain." *Id.* at 218, 85 S.Ct. at 407. His concurring opinion further pointed out that decisions concerning the basic scope of the enterprise are not in themselves primarily about conditions of employment even though the effect of the decision may be necessarily to terminate employment and that management decisions which are fundamental either to the basic direction of a corporate enterprise or which impinge only indirectly upon employment security should be excluded from the limited area subject to the duty of collective bargaining under the National Labor Relations Act. *Id.* at 223, 85 S.Ct. at 409. In the present case, it appears to me that we have a situation fundamental to the basic direction of the corporate restaurant enterprise.

Finally, the concurring opinion while acknowledging concern with the problems of automation, technical change, job security, and employment stability, concluded as follows:

It is possible that in meeting these problems Congress may eventually decide to give organized labor or government a far heavier hand in controlling what until now have been considered the prerogatives of private business management. That path would mark a sharp departure from the traditional principles of a free enterprise economy. Whether we should follow it is, within constitutional limitations, for Congress to choose. But it is a path which Congress certainly did not choose when it enacted the Taft-Hartley Act.

*Id.* at 225–26, 85 S.Ct. at 411.

It should be remembered in applying *Fibreboard* that all that was involved in that case was "the substitution of one group of workers for another to perform the same task in the same plant under the ultimate control of the same employer." *Id.* at 224, 85 S.Ct. at 410. In the case before this court, as was fully discussed in the ALJ's decision, the revenues derived from the operation of the restaurant had been sharply falling during the course of the previous year despite Davis' attempts to stimulate sales. I do not regard the substituting of the customer, who carries his or her own tray, as in any way comparable to the situation that was involved in *Fibreboard.*

The majority opinion seems to have made the full circle back to a *per se* rule although this is contrary to the clear lesson of *Fibreboard.* Thus the majority opinion refers to the traditional position of the Board as being that in all circumstances, except where an employer has decided to eliminate itself as an employer and completely shuts down a discrete line of business, the decision to terminate a portion of the business is the subject of mandatory bargaining. The majority opinion then cites *Ozark Trailers Inc.,* 161 NLRB 561 (1966). The Board's brief filed in this court makes it clear, however, that the Board's decision in this case did not rely upon the sweeping principle enunciated in *Ozark Trailers.*

Courts have made it clear that the holding in *Ozark Trailers* is not an acceptable one. Thus in *Royal Typewriter Co. v. NLRB,* 533 F.2d 1030, 1039 (8th Cir. 1976), Judge Webster writing for the court with reference to the holding in *Ozark Trailer* stated:

We squarely rejected that holding in *NLRB v. Drapery Manufacturing Co., supra,* 425 F.2d [1026] at 1027–28, and reaffirmed our adherence to the view set forth in *NLRB v. Adams Dairy, Inc.,* 350 F.2d 108, 110–13 (8th Cir. 1965), *cert. denied,* 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966), that absent union animus, a company has no legal duty to bargain with a union over the decision to partially shut down its operations because of economic reasons. *See also Morrison Cafeterias Consolidated, Inc. v. NLRB,* 431 F.2d 254, 257 (8th Cir. 1970). [Footnote omitted.]

In *International Union v. NLRB,* 152 U.S. App.D.C. 274, 276–77, 470 F.2d 422, 424–25, Justice Clark, sitting by designation in the D.C. Circuit, reviewed the cases of which *Fibreboard* was the avant-courier. The decision first emphasized the distinctions between *Fibreboard* and the case before the court, including the very significant element not present in the case before this court that the contracting out of maintenance work involved in *Fibreboard* had been brought within the collective bargaining framework and that it existed in numerous collective bargaining agreements and was the basis of many grievances. The opinion then referred to the fact that the courts of appeals had used a case-by-case approach. Some of the points noted are as follows:

If the decision appears to be primarily designed to avoid the bargaining agreement with the union or if it produces no substantial change in the operations of the employer, the courts have required bargaining. . . . If the decision resulted in the termination of a substantial portion or a distinct line of the employer's

business or involved a major change in the nature of its operations, no bargaining has been required. . . . The difficult cases have been those involving a small but not insubstantial proportion of the employer's business; in these cases, the results have often hinged on hints of anti-union animus. [Citations omitted.]

In the case before this court, as has already been noted, there is no contention that there was discriminatory conduct or anti-union animus and while the expenditure of capital in making the change may not have been a substantial one in terms of dollars, the very fact that Davis found himself in dire economic straits insofar as the operation of the restaurant was concerned would have eliminated the realistic possibility of a major capital expenditure. Instead he took a course which did in my opinion constitute a major change in the nature of the operation, in which case, under the established authority of the court cases, no bargaining on the decision to change should be required.

The Board in the present case, although not purporting to overrule its own precedents, has nevertheless failed to follow them. In *Summit Tooling Co.*, 195 NLRB 479 (1972), *enf'd sub nom. N.L.R.B. v. Summit Tooling Co.*, 83 LRRM 2044 (7th Cir. 1973), the Board disagreeing with the trial examiner, held that there was no violation of the duty to bargain on the part of the employer in closing a manufacturing operation without giving the union an opportunity to bargain concerning the decision to close. The Board conceded that this could be characterized as a partial plant closing but said that the practical effect was to take the employer out of the business of manufacturing certain products. "We do not believe that the Act contemplated eliminating the prerogative of an employer, as here, to eliminate itself as an employer, [footnote omitted]." *Id.* at 480. In the case before us the employer did not eliminate himself from the service of food but eliminated himself as a restaurant at which people could come in and sit down and have their orders taken by waitresses and in lieu thereof they became participants in a cafeteria line. It takes no expert testimony to realize that the clientele which patronizes a waitress-served restaurant is frequently quite different from that which goes to the cafeteria type of establishment. An immediately apparent, yet significant to the diner, difference between the two methods of operation is that the patron at the cafeteria is relieved of the necessity of adding to his bill for food a gratuity which ordinarily averages in today's restaurant market fifteen percent of the bill. As anyone who has had to meet the increasingly high cost of food knows, the amount of the tip added to the cost of the meal is no longer an inconsequential item. This was a major change of operation brought about solely for economic purposes.

In *Stanley Oil Co. Inc.*, 213 NLRB 219 (1974), the Board adopted the opinion of the ALJ whose decision, following the lead of *General Motors Corp.*, 191 NLRB 951 *enf'd sub nom. International Union v. NLRB, supra,* and *Summit Tooling Co., supra,* found that there was no duty to bargain on the closing of the servicing department as the employer took itself out of the business of servicing and severed completely its function as an employer of service employees. Here, of course, the employer severed his function as an employer of waitresses who served food to the class of patrons which class apparently was on the minimal side, and in doing so exercised his prerogative as an employer.

In *Vegas Vic Inc.*, 213 NLRB 841 (1974), *enf'd*, 546 F.2d 828 (9th Cir. 1976), *cert. denied*, 434 U.S. 818, 98 S.Ct. 57, 54 L.Ed.2d 74 the employer, without consulting the union, changed the operation of its bar from that of a sitdown bar to that of a service bar and a few months later, again without consulting the union, reversed its policy and changed the operation of its service bar back to a sitdown bar. This case more nearly than the previous cases parallels the situation of the case before this court. The ALJ found that the first change affected the terms and conditions of employment and even though the change was not discriminatorily motivated, the requirement

upon the part of the employer to consult the union before making the change was not altered. A three member panel of the Board summarily disagreed with the ALJ:

The Administrative Law Judge found that Respondent violated Section 8(a)(5) of the Act by changing its method of operation from a "sit-down" bar to a "service" bar without consulting the Union. We do not agree. The Act does not require bargaining in advance over such changes in method of operation. Rather, the Act's intent was to leave business management decisions of this kind to the employer, . . .

*Id.*

The majority opinion attempts to distinguish *Vegas Vic* from the present case on the basis that the Board found that the change required a considerable capital expenditure for installing a new bar in a different part of the premises. It is true that the ALJ, in determining a different question, i. e., whether the change in operation was motivated by an attempt to undermine the majority status of the union, referred to the fact that there was a considerable capital expenditure for installing a new bar, and concluded that because the sitdown bar had been operated at a loss that the change was made solely for economic reasons and not because of anti-union animus. The important factor for our present purposes is that there is no indication whatsoever, that I can discern, that the Board gave any significance in its opinion disagreeing with the ALJ to the fact of the expenditure of capital. The only reference was to a "change" in method operation. This, it seems to me, is purely and simply a business management decision.

The majority opinion rests heavily upon *Brockway Motor Trucks v. NLRB*, 582 F.2d 720 (3rd Cir. 1978). While it is true that the scholarly majority opinion in *Brockway* lends some support to the position taken in the majority opinion in the present case, I do not regard *Brockway* as mandating the result reached by the majority opinion in our case. As the court noted in *Brockway* on the subject of partial closings, "it seems

fair to say that the NLRB has taken a pro-bargaining stance that is at odds with the results reached by—and the language in—the opinions of several courts." *Id.* at 731. The *Brockway* opinion, while pointing out factors militating in favor of a duty to bargain before implementing a decision to close or change in the present area, nevertheless declined to enforce the Board's order relating to an unfair labor practice by *Brockway* because "the precise nature of the conditions leading to *Brockway's* decision is not known, we do not have the desirable, firm factual underpinning necessary to utilize the balancing approach enunciated in this opinion." *Id.* at 739–40.

In the case before this court we do not have the unspecified economic considerations adverted to in the *Brockway* decision. Here we have an undisputed clear and continuing economic loss situation. Further, I find *Brockway*, insofar as it does lend any support to the majority opinion in the present case, weakened by the vigorous dissent of Judge Rosenn who pointed out that the majority opinion departs from the principles of the Third Circuit's landmark decision in *NLRB v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3rd Cir. 1965), "and of views prevailing in a majority of federal appellate courts." *Id.* at 741. As Judge Rosen pointed out, "[a] further hearing by the Board would be merely an irrelevant inquiry into the degree and circumstances of the economic considerations which impelled the closing." *Id.* at 750. There is no necessity for such further hearing in the present case as the economic considerations are clear.

While the two opinions in *Brockway* provide much helpful background and, indeed, interesting reading, upon ultimate analysis they do not appear to me to require a different result than that which the Board so summarily reached in *Vegas Vic.*

In sum, the majority opinion in the present case contrary to the majority view does significantly abridge the employer's freedom to manage his business. It seems a fair conclusion from the Board's position in this case that while it is not here purport-

ing to adopt the rule of *Ozark Trailers*, nevertheless its clear direction is toward a *per se* rule that even though the motivation for suspending an operation of a business, in whole or in part, is because of economic factors and even though there is no discriminatory conduct nor anti-union animus involved, the employer must give notice to the union and negotiate on the discontinuance before taking any action thereon even though there is thereby a significant abridgement of the employer's freedom to manage his own business. There can be very few if any discontinuances of operations which will not affect the pay of employees. The Board now seems to be saying, without disavowing cases such as *Vegas Vic*, that notice and negotiation must precede the implementation of the decision. I think this is beyond the "limited area subject to the duty of collective bargaining" referred to in Justice Stewart's concurrence in *Fibreboard, supra*, as being prescribed by the Congressional Act. 379 U.S. at 223, 85 S.Ct. at 410.

The outcome of the present phase of this litigation would not be determined finally, however, even if we were to hold, as I think we should, that under the circumstances of this case there was no duty to bargain prior to the change of the method of operation. Earlier herein I referred to the second aspect of the subject, that of the duty, subsequent to the change of method of operation, to bargain, on demand, over the effects of the conversion. Davis concedes that this was his duty. It is clear from the record, however, that no appropriate demand was ever made subsequent to the changeover. It is essential under the authorities that there be some sort of a request or proposal to bargain over the effect on the employees. The union representatives were informed by employees about September 19 that the facility was closed and employees laid off. Moreover, union representatives were present at the facility for an arbitration hearing when the cafeteria opened on September 24. The union remained silent and did not seek either to discuss the changeover or test Davis' willingness to bargain over its effect. Neither the union nor the employees raised the issue until around four months later when the facility had been leased to K–P Associates and their negotiations to end the strike had failed.

In *International Offset Corp.*, 210 NLRB 854, 855 (1974), in the decision and order of the Board it was stated that the record revealed in that case that the unions knew or should have known at least by July 1972 that a shutdown was imminent, but there was no evidence that the union either requested or proposed to bargain over the effects on employees. The only position the unions took *vis-a-vis* the company was, rather, that the transactions which resulted in a large scale transfer of machinery were not actual sales but represented a relocation of plant and work. The Board held that the failure of both unions to seek bargaining over the decision and its effects on employees foreclosed a finding of a section 8(a)(5) violation. As stated by the Board, "[a]s neither Local 119 nor Local 1 requested bargaining, [the company's] willingness to bargain has never been tested and having never been tested, [the company's] conduct may not be found violative of the Act." *Id.* at 855. [Footnote omitted].

The same result was reached in *Stanley Oil Co., Inc., supra* at 225 and in *Vegas Vic, supra* at 841. In the latter case the Board, after stating its disagreement with the ALJ on the matter of the duty to bargain in advance of the change in method of operation, then referred to the second aspect of the question dealing with the "effect" as follows:

> . . . but where such a decision has some adverse effect on the employees, they may grieve or request negotiations on the subject of what corrective action the employees desire in order to cure any inequity to the employees which may have resulted from the change. Since the change had an effect on the employees' earnings, because it apparently resulted in the employees' receiving less tips from customers, there was a duty to bargain, upon request, about the effects of the change, i. e., whether additional economic benefits should be provided to compen-

sate the employees for the loss of tips which allegedly resulted from the change. *But here no such request was ever made.* Accordingly, we will dismiss this allegation of the complaint relating to the change in method of operation, and delete that portion of the remedial order relating thereto.

*Id.* [Emphasis added].

In any event, therefore, it would appear in the present case that a back pay order for wages lost subsequent to the changeover should not have been ordered.

For the reasons stated herein, it is my opinion that the Board's order should be denied enforcement in toto.