602 F.2d 244
 101 L.R.R.M. (BNA) 2841, 86 Lab.Cas. P 11,413
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
Southern New England Joint Board, Amalgamated Clothing &
Textile Workers Union, AFL-CIO-CLC, Intervenor,
v.
HALE MANUFACTURING COMPANY, Respondent.
No. 640, Docket 78-4176.
 United States Court of Appeals,
Second Circuit.
 Argued March 30, 1979.
Decided July 6, 1979.
 
 Mary Schuette, Atty., N.L.R.B., Washington, D.C. (John S. Irving, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, Washington, D.C., of counsel), for petitioner.
 Charles Donelan, Worcester, Mass. (Duane T. Sargisson, David P. Grossi, Bowditch & Dewey, Worcester, Mass., of counsel), for respondent.
 Before MOORE, FRIENDLY and MESKILL, Circuit Judges.
 MOORE, Circuit Judge:
 
 
 1
 The National Labor Relations Board (the "Board" or "NLRB") petitions this court pursuant to § 10(e) of the National Labor Relations Act, as amended, (the "Act"), 29 U.S.C. § 160(e) (1976), for enforcement of its order, 236 N.L.R.B. 31 (1978) issued against Hale Manufacturing Company (the "Company") on May 24, 1978. The order granted the NLRB's motion for summary judgment and found that the Company's refusal to bargain violated § 8(a)(5) and (1) of the Act. 29 U.S.C. § 158(a)(5) and (1)(1976). For the reasons set forth below, we deny the petition and set aside the order of the NLRB certifying the Union as the exclusive bargaining representative of the unit employees.
 
 I.
 
 2
 The Company maintains its principal office and place of business at Putnam, Connecticut, where it is engaged in the manufacture, sale, and distribution of synthetic textiles and related products. The Company also operates a warehouse in Dayville, Connecticut. Approximately 167 production and maintenence workers are employed at the two locations.
 
 
 3
 On November 1, 1976, the Southern New England Joint Board, Amalgamated Clothing and Textile Workers (the "Union") filed a petition with the Board seeking certification as collective bargaining representative of the Company's production and maintenance workers at the Putnam plant. On November 30, 1976, the Board approved a stipulation for certification upon consent election pursuant to which the parties agreed to hold an election on December 16, 1976, in a unit consisting of the Putnam production and maintenance employees. Subsequently, the parties amended the stipulation so that the unit would include the Dayville production and maintenance employees.
 
 
 4
 When the election was held as scheduled on December 16, 1976, 161 of the eligible employees voted. The resulting tally of ballots showed that 82 votes had been cast for, and 79 against, the Union. The Company subsequently filed objections to the election, alleging that the Union unlawfully interfered with the election in a number of specified ways.[1] In substance, the Company alleged that an atmosphere of fear and intimidation created by the Union precluded a fair vote and that the Union made illegal promises and/or misrepresentations of benefits which tainted the election.
 
 
 5
 Subsequently, the Regional Director conducted an administrative investigation of the Company's objections, pursuant to the Board's Rules and Regulations, Series 8, as amended, 29 C.F.R. § 102.69 (1977). In a Report on Objections issued on February 2, 1977, the Regional Director concluded that the Company failed to present a Prima facie showing of "substantial and material issues" which would warrant setting aside the election. Thus, he recommended that the objections be overruled and that the Union be certified as the bargaining representative of the relevant employees. He further noted that since his conclusion was based upon the assumption that the Company's proffered evidence was true, no hearing on the objections was necessary.
 
 
 6
 The Company then filed timely exceptions to the Regional Director's Report with the Board, requesting that the election be set aside, or, in the alternative, that a hearing be held regarding contested issues of fact. On May 27, 1977, the Board issued a decision adopting the findings and recommendations of the Regional Director.
 
 
 7
 On about June 13, 1977, the Company refused the Union's demand for bargaining. Subsequently, the Union filed an unfair labor practice charge with the Board, and the Board issued a complaint against the Company alleging an unlawful refusal to bargain.[2] The Company admitted its refusal to bargain but denied the validity of the Board's certification. On May 24, 1978, the Board granted the NLRB's motion for summary judgment, finding the Company's refusal to bargain a violation of § 8(a)(5) and (1) of the Act, 29 U.S.C. § 158(a)(5) and (1) (1976). The Board noted that all of the issues raised by the Company were, or could have been, litigated in the prior representation proceeding, and that the Company neither offered to adduce any newly discovered or previously unavailable evidence, nor alleged any special circumstances which would require the Board to reexamine the decision made in the representation proceeding. The Board's order requires the Company to cease and desist from the unfair labor practice found and from interfering with, restraining, or coercing employees in the exercise of their § 7 rights, to bargain with the Union upon request, and to post appropriate notices. The NLRB petitions this court for enforcement of its order.
 
 II.
 
 8
 The Company has refused to bargain with the Union, arguing that: (1) it is entitled to a hearing on its objections to the election; and (2) improprieties in the representation election render that election invalid. In our view, the most serious charge supporting the Company's position is the existence of an atmosphere of intimidation and fear of reprisal by the Union which precluded a fair election.[3]
 
 
 9
 In support of this allegation, the Company produced evidence that the following incidents occurred on the day of the election.[4] At approximately 10:30 a. m.[5] a unit employee wearing a Union button approached Edward Bourdia, a non-unit employee, at his work station on the third floor of the plant and asked his opinion of the Union. After Bourdia responded in negative terms, a second unit employee joined the conversation, offering Bourdia a Union button and asking him his opinion of the election. Bourdia analogized the election to the recent national Presidential election and stated that the "best man" would win. Upon inquiry, Bourdia then related the above conversation to a third unit employee who, after determining that Bourdia was ineligible to vote, expressed confidence that Bourdia's vote was unnecessary because "the Union was in".
 
 
 10
 Bourdia then took the elevator to the second floor, where he was joined by one unit and one non-unit employee, neither of whom had observed the third-floor conversation. After a brief period of work on the first floor, they re-entered the elevator. A pane of glass struck the wire mesh roof of the elevator car and shattered, causing some pieces of glass to fall to the floor of the car around the men. They immediately ascended in the elevator to the third floor, from which they suspected the glass had been dropped because of an opening there into the shaft.[6] Upon reaching the third floor, the men found all employees in their proper work places.[7] They did determine that the incident was not an accident, as all of the panes of glass in the elevator shaft on the upper floors were intact. However, they reached no conclusion as to who had dropped the glass. At least two unit employees were at or near the elevator on the first floor, and the Company produced evidence that one of these employees was frightened or fearful at the time of the election. Further the Company alleged that "news of the incident could and did spread throughout the plant on election day."[8] Another unit employee submitted an affidavit that he had heard of the incident and that the Union was somehow involved.[9]
 
 
 11
 The Board is vested with a wide degree of discretion with respect to representation election matters. Henderson Trumbull Supply Corp. v. NLRB, Region 2, 501 F.2d 1224, 1228 (2d Cir. 1974). This court has stated:
 
 
 12
 "The conduct of representation elections is the very archetype of administrative function, with no Quasi about it, concerning which courts should not interfere except for the most glaring discrimination or abuse." NLRB v. Olson Bodies, Inc., 420 F.2d 1187, 1189 (2d Cir. 1970), Cert. denied, 401 U.S. 954, 91 S.Ct. 966, 28 L.Ed.2d 237 (1971).
 
 
 13
 However, despite this broad discretion, a party is entitled to a hearing if it demonstrates by Prima facie evidence the existence of " 'substantial and material factual issues' which, if resolved in its favor, would require the setting aside of the representation election". NLRB v. Bristol Spring Manufacturing Co., 579 F.2d 704, 706-07 (2d Cir. 1978). If such a showing is made, a hearing is mandated both by the due process clause of the Fifth Amendment, Louis-Allis Co. v. NLRB, 463 F.2d 512, 520 (7th Cir. 1972), and by the applicable NLRB regulations. 29 C.F.R. § 102.69 (1977).[10] The court in Bristol Spring emphasized that the need for a hearing is particularly acute where an election is close, for in such cases, it cannot be assumed that even minor misconduct did not influence the outcome of the election. 579 F.2d at 707.
 
 
 14
 In the instant case, when the Company's evidence is measured against this standard, it is clear that, at the least, a hearing was warranted. The Board, citing Polymers, Inc. v. NLRB, 414 F.2d 999, 1005 (2d Cir. 1969), Cert. denied, 396 U.S. 1010, 90 S.Ct. 570, 24 L.Ed.2d 502 (1970), argues that no hearing was required because the Regional Director accepted the factual allegations of the Company as true. However, in Polymers, Inc. v. NLRB, supra, the court said: "Where, as here, the Board accepts the factual allegations of the company, and No additional facts remain to be developed, a hearing is unnecessary". 414 F.2d at 1005 (emphasis added). In contrast, in this case, additional facts remain to be developed and hence the Regional Director should have conducted a hearing.
 
 
 15
 The glass-shattering incident on election day merited further investigation. It was immediately preceded by an argument over unionization and was immediately followed by the election itself. There was evidence that several unit employees were aware of the incident and that at least some of the employees either believed that the incident was related to the election or felt intimidated. A hearing would have afforded the Company the opportunity to develop the facts and to obtain witnesses who could establish the effect of the incident on the attitudes of the unit employees and its link to the Union. Under these circumstances, the Board's conclusion that the "laboratory conditions"[11] necessary for a free and fair election were not affected by these incidents was too summary. Without such evidence, we cannot say, as a matter of law, that this and other incidents could not reasonably have created apprehension in the minds of the voters, thereby invalidating the election. General Electric Wiring Devices, Inc., 182 N.L.R.B. 130 (1970). Whether and to what extent the glass shattering incident affected the outcome of the election presents a "substantial and material factual issue" which requires a hearing for its determination.
 
 
 16
 We hold that, at the least, a hearing was required in this case. However, in view of the passage of time since the Company first made its objections, a hearing at this stage would at best be a partial and inadequate remedy. Not only would it be almost impossible to resurrect evidence concerning the atmosphere that existed during the relevant period, but also the composition of the unit has no doubt shifted. In this case, the only way to assure "laboratory conditions" are restored is to hold a new election. Thus, we deny the petition and set aside the order of the NLRB certifying the Union as the exclusive bargaining representative of the unit employees.
 
 
 
 [1]
 Specifically, the Company's objections alleged that:
 (1) the election was conducted in an atmosphere of intimidation and fear of reprisal in that two hours prior to the election, two employees were assaulted in an elevator shaft following a conversation regarding their votes in the election;
 (2) the Union exceeded the bounds of legitimate campaign activity by promising specific pension benefits to two employees;
 (3) the Union promised a specific $4.50 hourly wage to an employee if the Union was certified;
 (4) the Union promised an employee a position as a Union steward or business agent;
 (5) the Union promised the same employee named in the previous objection a position as head electrician at another company represented by the Union if the employee voted for the Union;
 (6) the Union promised an employee the job of shop steward if he voted for the Union;
 (7) the Union created an atmosphere of fear of reprisal among the employees if they talked to Company officials about the Union's promises of benefits; and
 (8) immediately after the election, three employees advised a Company official that they would "get even" with an employee who "spilled the beans" to the Company concerning the Union's pre-election campaign conduct.
 
 
 [2]
 The complaint also alleged that the Company had engaged in other conduct violating §§ 8(a)(3) and (5) of the Act. However, the parties entered into a settlement agreement with respect to the § 8(a)(3) allegations and the Union withdrew the charge upon which the additional § 8(a)(5) allegation was based. Thus, summary judgment was not sought with respect to these counts of the complaint
 
 
 [3]
 In view of our resolution of this issue, we find it unnecessary to reach the other objections raised by the Company
 
 
 [4]
 The Company also presented evidence that after a Union meeting held four days before the election, a unit employee who had criticized the Union was threatened in the presence of other employees by a Union advocate who said, "Remember you have a wife and child to think about". When the employee asked the Union manager if the statement was a threat, the manager did not reply
 
 
 [5]
 The polls were open from 2:00 p.m. to 3:45 p.m
 
 
 [6]
 A physical inspection of the elevator revealed that a similar, albeit smaller, opening exists at the second floor door, through which a pane of glass could be passed
 
 
 [7]
 Approximately 40 employees normally worked on the third floor
 
 
 [8]
 The Company alleges:
 "This violence took place only a few hours before the election and was published to 40 voters immediately after it happened and prior to the lunch break." (Hale Manufacturing Br. at 10 n. 2).
 
 
 [9]
 The Company arranged to have Peter Suhocke, a unit employee, speak with the NLRB examiner during the investigation of the objections. It was expected that he would tell the Union representative that he had heard that the glass shattering incident was a "union matter". However, no Company representatives were allowed to be present when Mr. Suhocke spoke to the NLRB representative. Since the Regional Director made no mention of any statement by Mr. Suhocke, the Company presented this information to the Board in the form of an affidavit by Mr. Suhocke
 
 
 [10]
 29 C.F.R. § 102.69 sets forth the procedures to be followed by a party objecting to an election. Specifically, 29 C.F.R. § 102.69(d) provides:
 "The action of the regional director in issuing a report on objections or challenged ballots . . . may be on the basis of an administrative investigation or, if it appears to the regional director that substantial and material factual issues exist which, in the exercise of his reasonable discretion, he determines may more appropriately be resolved after a hearing, he shall issue . . . (to) the parties a notice of hearing on said issues. . . ."
 
 
 [11]
 For a union certification to be valid, laboratory conditions necessary for the conduct of a free and fair election must be maintained. General Electric Wiring Devices, Inc., 182 N.L.R.B. 130 (1970). The general theory of laboratory conditions was expounded by the Board in General Shoe Corp., 77 N.L.R.B. 124, 127 (1948):
 "In election proceedings, it is the Board's function to provide a laboratory in which an experiment may be conducted under the conditions as nearly ideal as possible, to determine the uninhibited desires of the employees. It is our duty to establish these conditions; it is also our duty to determine whether they have been fulfilled. When, in the rare extreme case, the standard drops too low, because of our fault or that of others, the requisite laboratory conditions are not present and the experiment must be conducted over again."