**SPRING CITY KNITTING COMPANY,**
Petitioner,

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent.**

**International Ladies' Garment Workers'
Union, Intervenor.**

Nos. 80–7239, 80–7325.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 15, 1981.

Decided June 12, 1981.
As amended July 13, 1981.

Daniel F. Gruender, Shimmel, Hill, Bishop & Gruender, P. C., Phoenix, Ariz., for petitioner.

Marjorie S. Godfreed, Washington, D. C., for respondent.

Before ANDERSON, FLETCHER and FERGUSON, Circuit Judges.

J. BLAINE ANDERSON, Circuit Judge:

Spring City Knitting Company (Spring City) petitions for review of an order of the National Labor Relations Board (the Board) directing it to bargain with the intervenor here, the International Ladies' Garment Workers' Union (the Union), as the exclusive bargaining representative of a bargaining unit consisting of all production and maintenance employees and shipping and receiving employees at Spring City's Flagstaff, Arizona plant. The Board cross-petitions for enforcement of the order. We affirm and enforce the Board's order.

## I. BACKGROUND

Spring City Knitting Co., a subsidiary of Cluett-Peabody and Co., Inc., operates a Western Division which consists of a main plant located at Glendale, Arizona, and two smaller "satellite" plants located at Flagstaff, Arizona, and Deming, New Mexico. Spring City manufactures men's and boys' underwear. Each of the Western Division plants performs substantially similar operations. The Glendale plant employs approximately 700 workers, while Flagstaff employs approximately 150 workers. The issues raised by Spring City's petition relate only to the Glendale and Flagstaff plants.

On May 3, 1979, the Union formally petitioned the Board for certification as the exclusive bargaining representative of all production and maintenance employees at the Glendale plant. On May 9, the Union

filed a petition for certification as representative of a separate unit consisting of all production and maintenance employees at Flagstaff. The petitions were consolidated and a hearing was conducted on May 18 and 23. On June 6, the Regional Director issued a decision directing elections at Glendale and Flagstaff as separate units. In finding that each plant constituted a separate appropriate bargaining unit, the Regional Director relied mainly upon evidence which indicated that the local plant managers exercised "significant autonomy" over their respective facilities, evidence which failed to indicate significant employee interchange between the two plants, and the geographical separation between the plants. Spring City petitioned for review of the Regional Director's decision, a request which the Board denied on June 27 as raising no substantial issues warranting review. Such a denial constitutes affirmance under Board regulations. 29 C.F.R. § 102.67(f).

On June 28, 1979, a representation election was held at Flagstaff in which the Union received a majority of the votes cast. Spring City filed an objection to the election based upon certain alleged misrepresentations made by the Union prior to the election, and upon certain allegedly coercive campaign tactics practiced by the Union. On August 10, the Regional Director overruled Spring City's objections and certified the Union as the Flagstaff plant bargaining representative. Spring City requested Board review of the Regional Director's certification of the Union. The Board denied review of Spring City's objections, again on the ground that the company had raised "no substantial issues warranting review."

Following certification, the Union requested Spring City to bargain collectively. Spring City refused the request, and the Union responded with the filing of an un-

fair labor practice charge. The Regional Director issued a complaint on January 2, 1980, alleging that Spring City had committed an unfair labor practice by refusing to bargain with the Union. In its answer, Spring City admitted that it had refused to bargain, but raised as affirmative defenses the Regional Director's allegedly erroneous bargaining unit determination, and also the Director's overruling of its election objections without a hearing. After the matter was formally transferred to a Board panel, the Board granted on May 1, 1980, the General Counsel's motion for summary judgment on the ground that both the unit determination and the election objections had been raised and rejected in earlier proceedings. Accordingly, the Board ordered Spring City to cease and desist from refusing to bargain collectively with the union as the Flagstaff representative, affirmatively ordered it to so bargain, and directed that appropriate notices be posted. Spring City's timely petition for review followed.[1]

Spring City raises two issues in its petition: the appropriateness of the initial unit determination, and the Union's alleged election misconduct. Further facts will be developed in the course of the opinion.

## II. *APPROPRIATE BARGAINING UNIT*

 Our review of a Board determination that a particular bargaining unit is appropriate is narrowly circumscribed. Definition of an appropriate bargaining unit is a matter committed to Board discretion, *see* § 9(b), National Labor Relations Act of 1947, 29 U.S.C. § 159(b), and a bargaining unit determination should not be overturned unless the Board has abused its discretion. *See e. g., N.L.R.B. v. J. C. Penney Co., Inc., Store No. 29–9*, 620 F.2d 718 (9th Cir. 1980); *N.L.R.B. v. Retail Clerks*

---

1. Both the Regional Director's unit determination and certification of representative decisions are properly before us. Subject to certain narrow exceptions not relevant here, a Board decision on certification is not subject to judicial review on the employer's behalf except as a defense to a subsequent unfair labor prac-

tice charge based upon the employer's refusal to bargain with a certified bargaining representative. *See, e.g., Boire v. Greyhound Corp.,* 376 U.S. 473, 84 S.Ct. 894, 11 L.Ed.2d 849 (1964); *N.L.R.B. v. St. Francis Hospital of Lynwood,* 601 F.2d 404 (9th Cir. 1979).

*Local 588*, 587 F.2d 984 (9th Cir. 1978). The Board is not required to select the most appropriate bargaining unit so long as the unit chosen is within the range of units appropriate under the circumstances. *N.L.R.B. v. J. C. Penney Co., supra.* The present case involves the question whether a unit consisting of a single plant or a multiple plant unit should be designated. In making such a determination, the list of factors which the Board ordinarily considers includes:

> "... functional integration of the business, centralized control of management, similarity of working conditions, collective bargaining history, local power to hire and fire, lack of employee interchange, geographical distance."

*N.L.R.B. v. Sunset House*, 415 F.2d 545, 548 (9th Cir. 1968). There is a presumption that a single plant is an appropriate bargaining unit. *N.L.R.B. v. Lerner Stores Corp.*, 506 F.2d 706 (9th Cir. 1974). We find in this case that the Regional Director's reliance primarily on the last three elements of this analysis was proper and that his findings were supported by substantial evidence.

The evidence presented at the unit determination hearing consisted mainly of testimony given by Spring City Western Division President Allan Riley and certain documentary evidence. Riley's testimony painted a picture of the Western Division as a centralized unit whose production and personnel "brain" is located at the Glendale plant. Production control is implemented from Glendale. Division-wide finance, data processing, and accounting records are maintained at Glendale. Riley sets the annual budget for all three plants, and also sets inventory controls for each. Local plant managers may not deviate from their respective budgets without Riley's approval. The evidence also indicated a high degree of functional integration between Glendale and Flagstaff. Riley described in some detail the production operations performed at each plant. It is clear from the evidence that few functional differences exist. The Flagstaff plant is substantially similar to Glendale in terms of production methods, employee skill requirements, and finished products, the primary difference being that Flagstaff is run on a considerably smaller scale.

The record is also clear that formulation and implementation of labor relations and personnel policies takes place mainly at Glendale under Riley's supervision. All full-time employees within the division enjoy practically identical fringe benefits, including *inter alia* paid vacations, health insurance, life insurance, eight paid holidays annually, and a variety of smaller amenities. Compensation for employees of various skill classifications is uniform throughout the division. Personnel decisions such as promotions, transfers, layoffs, and recalls are made by Riley personally. All payroll processing takes place at Glendale, and all employee time records are maintained there. Manpower quotas for each plant are established by Glendale. Overtime requests must be approved by Riley. None of the local plant managers may deviate from these division-wide policies without approval from someone at Glendale, usually Riley.

The local plant managers are subject to a certain degree of direct oversight from Glendale on all phases of plant operation. Riley testified that he personally travels to Flagstaff "once a month" to check on the plant, while other supervisory personnel from Glendale go to Flagstaff every two or three weeks "on the average." Various types of telecommunications also keep Flagstaff in touch with Glendale on an everyday basis. There is a "constant" exchange of production information between the plants.

It was also clear from the evidence, however, that the local plant managers are not totally bereft of discretion in personnel matters. The local managers have the authority to hire and discharge within the manpower quotas established at Glendale. Plant managers may also "effectively" recommend promotions and merit increases, although none is final without Riley's approval.

Spring City introduced an exhibit at the hearing (Exhibit # 7) which listed by name a number of employees who had transferred

from one plant to another within the division from 1973 until the date of the hearing. While Riley pointed out that the list did not include all employees who had transferred during that time period, he did describe the exhibit as an "extensive" example of employee interchange within the Western Division. In the absence of something more concrete, we must treat Exhibit #7 as fairly approximating the frequency of inter-plant transfers during the six-year period from 1973 until 1979. The exhibit lists 21 employees who were transferred on a temporary basis, in most cases for not longer than a few days, during that period. Of these 21, Riley identified eight as "supervisors." While we are not prepared to adjudicate the supervisory status of each within the meaning of federal labor law, we take Riley's comments on each as an indication that those eight employees would likely not be included in the bargaining unit.[2] Of the remaining 13 who were either not described as "supervisors" or whose supervisory status at the time of the transfers was not clear to Riley, 6 were involved solely in transfers between Glendale and Deming.[3] Thus, only seven of the listed temporary transfers involving persons not clearly outside of the proposed bargaining unit involved a move between Flagstaff and Glendale, the longest of which was only a week in duration.[4] Of the 11 permanent transfers listed, seven were not within the requested bargaining unit.[5] Of the four permanent transfers by employees who appar-

ently would be included within the bargaining unit, one was a Deming to Glendale transfer. Thus, Spring City produced evidence of only three permanent transfers within its proposed two-plant bargaining unit over the six-year period immediately preceding the hearing.

The frequency of employee interchange is a critical factor in determining whether employees who work in different plants share a "community of interest" sufficient to justify their inclusion in a single bargaining unit. We have in past cases cited a relatively low degree of actual employee interchange among different plants as a strong indication that there is no collective "community of interests" among a proposed multi-plant bargaining unit. See *Victoria Station, Inc. v. N.L.R.B.*, 586 F.2d 672 (9th Cir. 1978) (8% yearly transfer rate among seven San Francisco Bay Area restaurants); *N.L.R.B. v. Lerner Stores Corp., supra* (10% interchange among seven chain stores); *N.L.R.B. v. Sunset House, supra* (no interchange at all). The Regional Director's finding that no significant interchange took place within the Western Division is supported by the record.

Spring City has argued that the Regional Director erred by attributing too much authority to the Flagstaff plant manager. The evidence, however, showed that the local plant manager has the authority to hire and discharge employees. Spring City cites decisions in which insufficient local

2. Riley identified Roy Carson, John Dennis, Jerry Fredericksen, Lacy Parker, Gene Rios, Gary Vandever, Bill Carlton, and Luther Dill as "supervisors" at the time of their respective transfers. Riley wasn't sure whether Jim Jackson, Lina Lopez or Elsa Pagotto were supervisors at the time of their transfers. Giving Spring City the benefit of the doubt, we do not include those three in the list of supervisors transferred.

3. Lina Lopez, Elsa Pagotto, Armida Delgado, Irene Orth, Harry Hampson, and Marie Rivera are all listed as employees based in Glendale who spent short periods of time working in Deming.

4. Jim Jackson, Virginia Romo and Wanda Richie each spent a few days in Flagstaff as instructors. Richie had recently been named a

supervisor at the time of the hearing, but apparently had not been so designated during her three-day stint at Flagstaff in 1973. Clyde Brandt spent a week in Flagstaff in 1974 for maintenance purposes. The status of Dee Vandever, who spent two days in Flagstaff in 1975, was unknown to Riley. Connie Castillo spent two days in Flagstaff in 1975 as an instructor. Vida Posey was in Flagstaff for two days in connection with a retail outlet selling Spring City products.

5. Salomon Castillo, Jr., Herb Nation, and Susan Nation were described by Riley as "supervisors." Bill Romo, Cletus Hicks, James Barrier, and Arvel Wyant are listed as "mechanics," a classification expressly excluded from the bargaining unit.

autonomy has been held to overcome the presumption that a single-plant unit is appropriate. *See N.L.R.B. v. Solis Theatre Corp.*, 403 F.2d 381 (2d Cir. 1968); *N.L.R.B. v. Davis Cafeteria, Inc.*, 396 F.2d 18 (5th Cir. 1968); *N.L.R.B. v. Purity Food Stores, Inc.* 376 F.2d 497 (1st Cir.), *cert. denied*, 389 U.S. 959, 88 S.Ct. 337, 19 L.Ed.2d 368 (1967); *N.L.R.B. v. Frisch's Big Boy Ill-Mar, Inc.*, 356 F.2d 895 (7th Cir. 1966). In only one of these cases, however, *N.L.R.B. v. Frisch's Big Boy Ill-Mar, Inc.*, did the authority of the local manager extend to hiring and discharge decisions. The geographical proximity of the various plants involved in *Frisch's Big Boy* serves to adequately distinguish that case from the present dispute. The plants involved here are approximately 140 miles apart.

The balancing of salient factors which we achieved in *Victoria Station, Inc. v. N.L.R.B., supra*, serves as an example here. We there held that a Board determination that a single restaurant constituted an appropriate bargaining unit instead of the employer's proposed seven restaurant unit was not arbitrary, capricious, or unsupported by the evidence. A combination of low employee interchange among the restaurants, significant local managerial autonomy, and a "wide" geographic dispersion over the Bay

Area was held sufficient to justify the Board's decision.

In the present case, while the degree of local control over labor relations is apparently not as great as in *Victoria Station*, neither is it so inconsequential as to require a multiple plant unit. The Flagstaff manager does exercise a degree of control over collective bargaining subjects. The degree of employee interchange is even lower than in *Victoria Station*, while the geographic dispersion of the plants is much wider. When we consider the additional factor of a lack of collective bargaining history, we must conclude that a rational basis existed for the Regional Director's decision, and that it was neither arbitrary nor capricious. The unit chosen was appropriate.[6]

### III. *UNION ELECTION MISCONDUCT*

Following the Union's victory, Spring City filed an objection to the election based upon two allegations of Union misconduct in the course of the election campaign. Spring City challenged several misrepresentations which appeared in Union campaign literature circulated eight days prior to the election, and also claimed that the actions of Union organizers during the campaign interfered with, restrained and coerced

---

**6.** Spring City has also raised the issue of the allegedly improper issuance of a large number of subpoenas to Spring City employees by counsel for the Union to compel attendance at the unit determination hearing. According to Spring City, Union counsel conceded during a hearing recess that he did not intend to call any of the subpoenaed witnesses and that they had been subpoenaed for "propaganda" purposes. When on the record, he backed off somewhat and stated that while he did not *presently* intend to call any of the witnesses, it might become necessary to do so in order to rebut Riley's testimony. He justified the large number of subpoenas on the ground that representation from each of Spring City's many production departments was necessary. The hearing officer denied Spring City's motion to revoke the subpoenas.

Spring City claims that the Union's alleged abuse of process constituted "prejudicial error." We do not see how the mere presence of a large number of employees could prejudice the outcome of the unit determination hearing in any significant fashion. We must comment, however, on what we perceive as an egregious abuse of the subpoena power if indeed the

employees were summoned for the sole purpose of "propaganda" on the Union's behalf. Since counsel's remarks do not appear on the record, we cannot determine whether his "propaganda" purpose has been established. The hearing officer accepted counsel's alternative explanation. We condemn any misuse of legal process, and caution that the type of misuse alleged here by Spring City should be regarded as a gross breach of professional ethics. Spring City complains that it has suffered economic injury as the result of the Union's action because many of the subpoenaed employees were away from their work stations during the hearing. We cannot express strongly enough our disapproval of the misuse of the legal system as a subtle "weapon" in labor conflicts. The role of the federal labor law is to discourage industrial strife, and all who come before the Board or this court are bound to respect that role, not to engage in conduct which flagrantly subverts it.

In fairness, we note that counsel for the Intervenor Union on this appeal were *not* counsel at the unit determination hearing.

Spring City employees in the exercise of rights guaranteed by § 7 of the National Labor Relations Act, 29 U.S.C. § 157. The Regional Director denied Spring City's objections without a hearing. Spring City here alleges as error not only the denial of the substance of its charges, but also the denial without a hearing.

█ In reviewing the Regional Director's overruling of election objections which charge union misconduct, we are guided by principles well-established in cases far too numerous to cite in detail. The Board enjoys a wide discretion in conducting and supervising representation elections. *Summa Corp., v. N.L.R.B.*, 625 F.2d 293 (9th Cir. 1980); *N.L.R.B. v. Masonic Homes of California*, 624 F.2d 88 (9th Cir. 1980). We apply the abuse of discretion standard to Board denials of evidentiary hearings on election objections. *N.L.R.B. v. Miramar of California, Inc.*, 601 F.2d 422 (9th Cir. 1979). In order to obtain a hearing on post-election objections, a party must make a prima facie showing of facts that present "substantial and material factual issues" which, if true, would constitute grounds for the Board to set aside the election. *N.L.R.B. v. Masonic Homes, supra.* In order for an election to be overturned, the objecting party must present evidence of proscribed conduct which prevented the employees from freely registering their choice of a bargaining representative. *Hecla Mining Co. N.L.R.B.*, 564 F.2d 309, 314 (9th Cir. 1977).

### A. Union misrepresentations

On June 19, 1979, eight full days prior to the representation election on June 28, the Union distributed a handbill at the Flagstaff facility which charged, in essence, that an earlier announcement by Spring City that it would be closing its Deming, New Mexico facility was false and that management had made the announcement for the sole purpose of intimidating the employees into voting against union representation at Flagstaff. The handbill asserted that Spring City had earlier attempted the same sort of scare tactic at its Georgia plants and had failed. The Regional Director over-

ruled Spring City's objection because the eight-day interval between publication of the handbill and the election gave the company a sufficient amount of time to respond to any portion of the handbill which it considered inaccurate.

█ Contrary to Spring City's assertions before this court, the presence or absence of an opportunity to respond is a factor which the Regional Director may properly take into account in determining whether to overturn a representation election on the basis of alleged campaign misrepresentations. An election is set aside due to misrepresentations " 'only where one party has misrepresented material facts, the other had no opportunity to reply, and the resulting distorted presentation significantly impaired the election process.' " *Heavenly Valley Ski Area v. N.L.R.B.*, 552 F.2d 269, 272 (9th Cir. 1977), *quoting N.L.R.B. v. G.K. Turner Associates*, 457 F.2d 484 (9th Cir. 1972). *See also N.L.R.B. v. Masonic Homes of California, supra.* We have recently upheld denial of an evidentiary hearing where the employer made no attempt to dispel alleged misstatements made by union officials eight days prior to a representation election, and the employer presented no evidence that the vote of any employee was actually affected by the misrepresentation. *N.L.R.B. v. Calco-Imports-Exports*, 621 F.2d 1029 (9th Cir. 1980). Spring City's contention that it lacked a meaningful opportunity to respond is without merit.

█ Another factor not cited by the Regional Director supports the decision. The alleged misrepresentations related to a matter of company policy, and not a matter of union policy. We have held that in such cases the objecting employer should present evidence that the employees were likely to "accept uncritically" the union's assertion. *El Monte Tool & Die Casting, Inc. v. N.L.R.B.*, 633 F.2d 160 (9th Cir. 1980). We conclude that the Regional Director did not err in overruling Spring City's first objection without an evidentiary hearing.

### B. Coercive Union conduct

Spring City alleged several specific instances of Union conduct during the elec-

tion campaign which it claims were sufficient to warrant an evidentiary hearing on its charge of Union coercion. A subsequent investigation by the Regional Director uncovered other potentially coercive acts. The Regional Director nonetheless overruled Spring City's second objection. We review briefly the evidence reflected by the record.

An affidavit by Dorothy LeFountain, an office clerk at Flagstaff, related an incident which occurred sometime in mid-April, 1979. LeFountain observed two men, one of whom wore a jacket bearing the Union insignia, enter the plant during working hours and begin inspecting employee time cards. The two men ignored LeFountain's request that they leave, until other male employees intervened. LeFountain was not sure whether cutting room employees could overhear the conversation. LeFountain was not a member of the proposed bargaining unit.

A pair of affidavits by employee Josie Vasquez, a member of the bargaining unit, related a series of attempts by union adherents to persuade her to vote for the union. Three weeks prior to the election, employees Maria Hamet and Leonora Rivas came to her home, accompanied by a Union organizer. The organizer allegedly charged the company with "cheating" the employees, and told Vasquez that the Union could get the company to pay vacation time and sick leave. After a discussion with the organizer, Vasquez accepted a proffered authorization card and some union literature, but immediately threw both in the trash in the presence of the organizer. On June 23, another employee told Vasquez that the company had "lied" about the Deming closing, but the subject was dropped at Vasquez' request. On June 26, Hamet again came to Vasquez' home and attempted to enlist the aid of her husband and her brother in recruiting her to the Union cause. On June 28, the day of the election, Vasquez was greeted by the same Union representative, who told her that she "had" to take a card that was offered. When Vasquez refused the card, the organizer's male companion told Vasquez to "cool it." Vasquez

also stated that every day during the week immediately before the election, someone would place union literature at her work station.

An affidavit by Fern Luna, a quality control supervisor at Flagstaff, stated that on June 27 she observed through a glass door several Union organizers who were handing out campaign literature to employees leaving the plant at the close of the work day. Luna observed one man whom she believed to be a Union organizer hold a camera up to his eye as if he were taking pictures of everyone who was leaving the plant. She also observed at about the same time one Union organizer attempt to hand literature to a female employee who ignored the organizer. Rather than give up, the organizer persisted and began walking backwards in front of the employee, blocking her path when she attempted to pass. The organizer did not relent until the employee crossed the street.

Rick Jones, a cutting room supervisor, stated that on June 26 he observed several Union organizers passing out literature at the end of the shift. The resulting congestion forced the departing employees to exit four or five abreast. One female organizer had a camera in her hand and made several motions as if to take pictures of the employees. Jones stuck his head out the door and asked the organizers to step back to the public driveway and off company property. While the organizers complied, Jones reported that they almost immediately returned to their original position five to six feet away from the exit doors. Fifteen minutes later, an employee approached Jones and asked if Jones could get "those damned people" away from the door. Jones related that on five or six different occasions that week he asked the organizers to step back, and that each time they would resume their original positions after he left.

Salomon Castillo, Flagstaff plant manager, described in general terms the pattern of literature distribution. Beginning approximately two months before the election, anywhere from two to five organizers would position themselves on company property approximately six feet in front of

the doorway. The organizers at first appeared approximately twice a week. As election time grew nearer, the organizers showed up on an almost daily basis. Sometimes the delay in leaving the plant would last up to five minutes because of the congestion resulting from the organizer's activities. Castillo also asked the organizers to step back a few feet to the public driveway on several occasions, only to have his request ignored after he left. On June 24, as he was leaving the plant with two company officials, Castillo was "sarcastically" asked by one of the female organizers if she was on company property. Apparently, some unit employees were near enough to have overheard the organizer's comments. The affidavit of Josie Vasquez corroborates Castillo's observation of considerable congestion and delay caused by literature distribution.

Irene Espino, a sewing room supervisor at Flagstaff, related that an employee approached her approximately two weeks prior to the election and asked if she could leave via the rear entrance so as to avoid the organizers and their literature. Espino replied that she could not because the rear entrance was reserved for truck loading only. No other employee complained to Espino.

Spring City argues that these affidavits raise substantial and material issues of fact regarding Union coercion of employees. Spring City contends that the acts described individually and collectively demonstrate coercive action on the part of the Union. According to Spring City, the Union's distribution methods were more serious than a simple trespass. Spring City cites the instances wherein certain employees complained of the Union's activities, and the incident wherein one employee's path was blocked as she walked from the plant to the street as evidence of the coercive impact which the Union campaign tactics carried. Spring City also cites a number of other incidents, including the taking of employee pictures as they left, and further points to the Union's misuse of its subpoena power.

We have considered the record and each of the incidents, and find no merit to Spring City's contentions.

An objecting party who claims that campaign tactics in a representation election were so coercive as to require overturning the election faces a heavy burden. The question is "whether the coercive conduct so influenced potential voters that a free choice by employees was impossible." *N.L.R.B. v. Masonic Homes of California, supra*, 624 F.2d at 90. The critical element which is lacking in Spring City's presentation is evidence that any employee felt so coerced by the Union's activities that he or she was unable to exercise a free choice at the polls.

None of the activities alleged was so inherently intimidating that we are free to presume coercive effect. The record reflects an election campaign marked by Union conduct which was uniformly aggressive, sometimes overbearing, and occasionally obnoxious. The Union's tactics did not, however, involve any violence, threat of violence, or vandalism. No overt threat of reprisal appears in the record, and we find no subtle threats implied. This is not a case such as *N.L.R.B. v. Masonic Homes, supra*, wherein employee fears of union reprisal appeared in the record, nor a case such as *N.L.R.B. v. Hale Manufacturing*, 602 F.2d 244 (2d Cir. 1979), wherein, on the day of the election, an act of violence was directed toward an employee who had made remarks disparaging the union. That many of the employees at Spring City found the Union's tactics distasteful and irritating is clear. The recorded, however, is devoid of any indication of intimidation. The only affidavit authored by a unit employee, that of Josie Vasquez, discloses no feeling of coercion. While the taking of employee photographs might in some instances rise to an implied threat of reprisal, we see no evidence here to support such a conclusion. In sum, we find that none of the individual incidents appearing in this record would have justified overturning the election.[7]

---

**7.** We do not find support in the record for Spring City's assertion that the Union "re-

peatedly" promised that certain benefits would result from it becoming the plant's bargaining

We also reject Spring City's argument that the Union's disregard of its requests to stay off company property demonstrated to the employees the company's inability to stand up to the Union. No evidence suggests that any employee so viewed the incidents. Also, Spring City offers no explanation why it was powerless to stop the Union from trespassing. There is similarly no merit to Spring City's contention that the alleged misuse of subpoenas at the unit determination hearing also put the company in a bad light in front of the employees.

Finally, we reject Spring City's argument that the cumulative impact of each of the incidents alleged requires us to find improper coercion. We heed the admonition of *Melrose-Wakefield Hospital Assn. v. N.L. R.B.*, 615 F.2d 563 (1st Cir. 1980) that "totality" arguments in this context should be approached cautiously. The First Circuit requires "detailed evidence of the pattern the activity formed and its influence on the election." *Id.* at 570. There certainly was no such detailed showing here. We decline to hold that the aggregation of the Union's legal, if not entirely ethical, activities indicated any degree of employee coercion.

We hold that the Regional Director did not abuse his discretion in overruling Spring City's objections without an evidentiary hearing.

## IV. *CONCLUSION*

The Board acted properly in certifying the Union as the Flagstaff bargaining representative, and in ordering Spring City to bargain with the Union. The record discloses no abuse of discretion. We deny Spring City's petition to deny enforcement, and grant the Board's petition to enforce.

representative. Only the Vasquez affidavit reflects the oral promise of such benefits. There is no evidence that any Union organizer made promises to other employees.