### NATIONAL LABOR RELATIONS BOARD, Petitioner,

v.

### CARSON CABLE TV; Inglewood Cable TV; TCI of Pomona Cable TV; and Cable Management Company, Respondents.

No. 85–7548.

United States Court of Appeals, Ninth Circuit.

Submitted May 8, 1986*.

Decided July 30, 1986.

---

\* The panel unanimously finds this case suitable for decision without oral argument. Fed.R. App.P. 34(a); Ninth Circuit Rule 3(f).

Barbara Atkin, Washington, D.C., for petitioner.

Eric P. Simon, Kreitzman & Mortensen, New York City, Gary Kessler, Los Angeles, Cal., for respondent.

Before KENNEDY, BEEZER, and HALL, Circuit Judges.

BEEZER, Circuit Judge:

The National Labor Relations Board ("Board") has applied to this court for enforcement of its order requiring the respondents, Carson Cable TV ("Carson"), Inglewood Cable TV ("Inglewood"), TCI of Pomona Cable TV ("Pomona"), and Cable Management Company ("CMC"), to bargain collectively with the Communications Workers of America, Local 11513. The Board found that the respondents had committed an unfair labor practice by refusing to bargain collectively in violation of the National Labor Relations Act ("NLRA") section 8(a)(5) and (1), 29 U.S.C. § 158(a)(5) and (1).

The respondents contend that that the Board improperly certified the union as bargaining representative of all their field employees because (1) the finding that respondents constitute a single employer is not supported by substantial evidence, and (2) the designation of a single multi-location bargaining unit of field employees was inappropriate.

We affirm the decision of the Board and grant the application to enforce the order.

## I

### Background

Carson, Inglewood, and Pomona operate cable television systems in their respective communities in the greater Los Angeles area. CMC, a cable management company, conducts management and administrative activities for Carson, Inglewood, and Pomona.

On July 26, 1983, the Communication Workers of America filed a petition under section 9(c) of the NLRA, 29 U.S.C. § 159(c), seeking certification as the exclusive collective bargaining representative for all of the respondents' employees. The Regional Director of the National Labor Relations Board found that all of the respondents together constituted a single employer and that a single multi-location bargaining unit of field employees was appropriate. On September 11, 1984, the Board

affirmed the Regional Director's decision and direction for an election.

By secret ballot, a majority of the respondents' technical employees voted to be represented by the union.[1] On September 27, 1984, the Regional Director certified the union as the collective bargaining representative of the respondents' technical employees in that multi-location bargaining unit.

Following its certification, the union made a formal demand on the respondents for bargaining and requested information concerning the employees' terms and conditions of employment. The respondents refused to bargain and declined to furnish the requested information.[2]

On April 1, 1985, the Regional Director issued a complaint alleging that the respondents had violated section 8(a)(5) and (1) of the NLRA, 29 U.S.C. § 158(a)(5) and (1), by refusing to negotiate with the certified bargaining representative. The respondents denied any violation of the Act and contended that the bargaining unit certified by the Board was inappropriate. On August 20, 1985, the Board granted the General Counsel's motion for summary judgment and ordered respondents to bargain with the union. The Board now seeks enforcement of its order pursuant to section 10(e) of the NLRA, 29 U.S.C. § 160(e).

## II

### Single Employer Finding

The Board found that all of the respondents constitute a single integrated business enterprise and thus are a single employer for labor relations purposes. Under section 10(e) of the NLRA, we review the

Board's conclusion to determine whether it is supported by substantial evidence on the record. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 488, 71 S.Ct. 456, 464, 95 L.Ed. 456 (1951). In conducting our review, "in light of the special expertise of the Board, we will defer to the reasonable derivative inferences drawn by the Board from credited evidence." *See NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d 924, 928 (9th Cir.), *cert. denied*, 449 U.S. 919, 101 S.Ct. 318, 66 L.Ed.2d 147 (1980).

 It has long been settled that the Board may treat two or more distinct business entities as a "single employer" within the meaning of section 2(2) of the NLRA, 29 U.S.C. § 152(2).[3] *NLRB v. Don Burgess Construction Corp.*, 596 F.2d 378, 384 (9th Cir.), *cert. denied*, 444 U.S. 940, 100 S.Ct. 293, 62 L.Ed.2d 306 (1979). To determine single employer status, the Board considers four basic criteria: (1) interrelation of operations, (2) common management, (3) centralized control of labor relations, and (4) common ownership. *South Prairie Construction Co. v. Operating Engineers Local 627*, 425 U.S. 800, 802 n. 3, 96 S.Ct. 1842, 1843 n. 3, 48 L.Ed.2d 382 (1976) (per curiam) (quoting *Radio Union v. Broadcast Service, Inc.*, 380 U.S. 255, 256, 85 S.Ct. 876, 877, 13 L.Ed.2d 789 (1965)); *Carpenters' Local Union No. 1478 v. Stevens*, 743 F.2d 1271, 1276 (9th Cir. 1984), *cert. denied*, — U.S. —, 105 S.Ct. 2018, 85 L.Ed.2d 300 (1985).

The Board has stressed the first three of these factors, in particular the presence of control of labor relations, because these factors tend to show "operational integration." *Sakrete, Inc. v. NLRB*, 332 F.2d 902, 905 n. 4 (9th Cir.1964), *cert. denied*,

---

1. The vote was 9 to 5 in favor of the union, with 2 challenged ballots, an insufficient number to affect the results of the election.

2. An election certification does not constitute a final order which can be appealed to the courts of appeals. The respondents refused to bargain in order to obtain review of these issues through an appeal from an order to bargain following an unfair labor practice proceeding. The respondents properly preserved their objection to the designation of the multi-location bargaining

unit, and we have jurisdiction to review those issues. *See NLRB v. Island Film Co., Inc.*, 784 F.2d 1446, 1450 n. 5 (9th Cir.1986).

3. Section 2 of the NLRA provides:

 (1) The term "person" includes one or more individuals, labor organizations, partnerships, associations, [or] corporations....

 (2) The term "employer" includes any person acting as an agent of an employer, directly or indirectly....

379 U.S. 961, 85 S.Ct. 649, 13 L.Ed.2d 556 (1965). However, no one of these factors is controlling, and the presence of all four factors is not necessary to a finding of single employer status. *NLRB v. Don Burgess Construction Corp.*, 596 F.2d at 384; *NLRB v. Big Bear Supermarkets No. 3*, 640 F.2d at 930. The ultimate determination of single employer status depends upon all of the circumstances of the case. *NLRB v. Don Burgess Construction Corp.*, 596 F.2d at 384. We will consider each of the relevant factors in turn.

### A. Common Ownership

Carson, Inglewood, and Pomona are California corporations that have been awarded cable television franchises in their respective communities.

Inglewood and Pomona were originally owned and managed by Six Star Cable Vision. TCI Growth, Inc., a subsidiary of Telecommunications, Inc. ("TCI"), purchased 20 percent of Inglewood stock and 80 percent of Pomona's stock in 1982. The remaining stock is held by individuals—298 in the case of Inglewood and 25 in the case of Pomona. Carson is principally owned by Marvin Roseman.

Shortly after the TCI subsidiary purchased stock in Inglewood and Pomona, TCI and Roseman created a new corporation—CMC—to manage Inglewood, Pomona, and Carson. TCI owns 80 percent of CMC, and Roseman owns the other 20 percent.

Roseman serves as president of CMC and Teresa Speir is its area manager. Speir was formerly employed by TCI, and now reports to both Roseman and to a TCI vice-president. CMC shares office space with the Carson facility.

Although it is true that no one entity has a controlling interest in all four entities and that there is no complete identity of ownership interests, it is apparent that a pattern of common ownership exists among the four businesses through the combined ownership interests of TCI and Roseman.

### B. Common Management

CMC hires the system manager for each of the three cable television facilities, and those system managers report to CMC area manager, Speir. The system managers in turn are responsible for hiring and firing his or her own staff. CMC is informed of each personnel action and prepares the necessary paperwork, which is in turn forwarded to TCI. Neither CMC nor TCI has ever vetoed a hiring decision made by a system manager, although respondents appear to acknowledge that CMC or TCI possess the actual authority to exercise such a veto. In addition, TCI prepares the payroll for each system and issues the paychecks.

CMC establishes operating procedures for the systems under which each system manager is to run the day-to-day operations of each respective system. A TCI accounting manual prescribes accounting procedures for each system. A CMC-prepared document sets forth operating rules for the public access channel.

Although each system has its own office, equipment, customers, and budget, CMC reviews the budgets drafted by each system manager and forwards them to TCI, which has the ultimate authority over budget questions. CMC or TCI also advance the funding to cover most major expenses, including cable network charges, programming fees, and construction costs. These advances are later charged back to the individual system. Local expenses, such as utilities, gasoline, office supplies, and rent, are paid directly by each system out of its individual bank accounts.

The Board reasonably concluded that, through CMC, TCI and Roseman maintain a degree of control at the policy level for all three systems. Each system operates within certain general guidelines prescribed by CMC. The Board's conclusion that ultimate authority is vested in CMC, which is controlled by TCI and Roseman, is the product of reasonable inferences drawn from the evidence.

### C. Interrelation of Operations

The three systems are the only systems managed by CMC, and they are located in

close geographical proximity to each other in the greater Los Angeles area. Each system does maintain its own antennae for receiving satellite signals and its own equipment and physical plant for delivery of television signals to subscribers. However, there is a significant degree of interrelation as the systems share common management and some centralized administration, as well as certain facilities and services.

An accounts payable clerk employed by CMC provides clerical and bookkeeping support for the three systems. A regional engineer provided by CMC spends about 40 percent of his time visiting the three systems to assist with technical problems. A CMC converter technician repairs converters for all three systems at the Pomona system's warehouse. A public access coordinator working for CMC assists all three systems in fulfilling their public access responsibilities. The main studio for public access programming—used by the public in all three communities—is at the Carson facility.

The field employees at each of the three systems install, connect, disconnect, and maintain the cable hardware in subscribers' homes. At one point, the field employees at Carson and Inglewood were supervised by the same chief technician. Now the chief technician at Carson visits Inglewood twice a month to assist its field staff. For a time, a customer service representative at Carson did the scheduling of assignments for field employees at both Carson and Inglewood. At least one field employee works in more than one system as part of his regular duties.

In addition, employees are occasionally transferred from one to another of the three systems to meet temporary staffing problems. In such cases, the system receiving the help is billed by the home system. There appears to be a general freedom for each system to call on employees at one of the other systems for assistance when needed. There has been at least one permanent transfer among the three systems, and several transfers from TCI to CMC or the systems. These employees were considered "transfers," not new hires.

Accordingly, the Board reasonably found that, although nominally autonomous, the three systems are in fact linked together on numerous levels. On balance, the record shows a sufficient degree of interrelationship to add support to a finding of single employer status.

*D. Centralized Control of Labor Relations*

As noted above, although each system manager hires and fires that system's employees, he or she is ultimately accountable to CMC. Moreover, TCI has established a uniform fringe benefit package covering holidays, vacations, sick leave, and insurance for all employees. The wages set by the system managers vary between the systems only by about 50–75 cents per hour. Each system has adopted its own bonus program. Payroll is centralized and paychecks are issued by TCI.

At least on occasion, CMC and the three systems have combined their workforces for training and for social purposes. Although most training is conducted at the system level, CMC prepares the training material and the regional engineer has held a joint training session for all field engineers. All employees were invited to a common picnic and to the Christmas party.

Finally, at the hearing held in response to the union's representation petition, only a CMC representative appeared before the Regional Director on behalf of all three systems because, as CMC's area manager Speir testified, CMC handles labor relations questions for all three systems.

On the basis of this evidence, the Board reasonably concluded that effective control over labor relations is centralized in the hands of CMC. The fact that day-to-day control of labor relations at the "worker level" is left in the hands of system managers is not dispositive. *See NLRB v. Don Burgess Construction Corp.*, 596 F.2d at 385. Where the major labor policy decisions are made by a central authority, the Board may reasonably find that the criteri-

on of centralized control of labor relations has been met. *See id.* at 385; *Sakrete, Inc. v. NLRB*, 332 F.2d at 907.

### E. Conclusion

The Board concluded that Carson, Inglewood, Pomona, and CMC are a single integrated enterprise and a single employer because they share a degree of common ownership, significant aspects of their labor relations and operations are centrally controlled, and their management is directed by CMC.

Under the deferential substantial evidence standard, we may not reverse the Board simply because we disagree with its evaluation of the facts, but only if we find that its evaluation is not supported by substantial evidence. Considering the evidence in the record as a whole, it was a reasonable conclusion that there is "an absence of an arm's length relationship between the business entities in question." *NLRB v. Big Bear Supermarkets No. 3,* 640 F.2d at 930. The determination that the respondents constitute a "single employer" is affirmed.

### III

### Appropriate Bargaining Unit

The Regional Director determined, and the Board affirmed, that a multi-location unit sought by the union is an appropriate bargaining unit for all field employees employed at the three systems and working out of the CMC office.[4]

The determination of an appropriate bargaining unit under section 9(b) of the NLRA, 29 U.S.C. 159(b),[5] is a matter committed to the Board's broad discretion. *Spring City Knitting Co. v. NLRB,* 647 F.2d 1011, 1013 (9th Cir.1981); *NLRB v.*

**4.** The multi-location unit for field employees was described as follows:
All field employees, including installers, technicians, warehousemen, and construction employees employed by Carson Cable TV, Inglewood Cable TV, TCI of Pomona Cable TV, and Cable Management Company ...; excluding all other employees, sales employees, office clerical employees, guards and supervisors as defined in the Act.

*Don Burgess Construction Corp.,* 596 F.2d at 386. We will not overturn the Board's unit designation unless the decision is "arbitrary and capricious." *Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491, 67 S.Ct. 789, 793, 91 L.Ed. 1040 (1947); *Alaska Statebank v. NLRB,* 653 F.2d 1285, 1287 (9th Cir.1981). Accordingly, the Board's decision "will rarely be disturbed on appeal." *Alaska Statebank,* 653 F.2d at 1287.

In *NLRB v. Don Burgess Construction Corp.,* 596 F.2d at 386, we described the analysis to be applied in a case such as this:

In determining the appropriateness of a bargaining unit the focus differs from that employed in deciding whether there is a single employer. "In determining whether a single employer exists we are concerned with the common ownership, structure, and integrated control of the separate corporations; in determining the scope of the unit, we are concerned with the community of interests of the employees involved." *Peter Kiewit Sons' Co.,* 231 N.L.R.B. 76, 77 (1977).

*See also South Prairie Construction Co. v. Local No. 627, International Union of Operating Engineers,* 425 U.S. 800, 805, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976) (per curiam).

 The Board, in evaluating the community of interests among employees working at more than one location, considers several factors, including (1) similarity in employee skills, duties, and working conditions, (2) functional integration of the business, including employee interchange, (3) centralized control of management and supervision, (4) geographical separation of facilities, (5) collective bargaining history and extent of union organization, and (6)

**5.** Section 9(b) provides that the Board "shall decide in each case, whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this Act, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof...."

employee choice. *See Spring City Knitting Co.*, 647 F.2d at 1014; *Pacific Southwest Airlines v. NLRB*, 587 F.2d 1032, 1038 (9th Cir.1978); *NLRB v. Sunset House*, 415 F.2d 545, 548 (9th Cir.1969).

"Because unit determinations are dependent on slight variations of facts, the Board decides each case on an *ad hoc* basis, and it is not strictly bound by its prior decisions." *NLRB v. J.C. Penney Co., Inc.*, 620 F.2d 718, 719 (9th Cir.1980); *see also Pacific Southwest Airlines*, 587 F.2d at 1038. Each decision ultimately rests on the particular circumstances of that unique case.

A. *Similarity in Employee Skills, Duties, and Working Conditions*

"The most reliable indicium of common interests among employees is similarity in their skills, duties, and working conditions." *Pacific Southwest Airlines*, 587 F.2d at 1042.

The approximately 14 field employees have identical skills, duties, and interests. The field employees in each system fill the same job classification and perform the same tasks, using the same types of tools under the same working conditions.

In addition, all are subject to certain uniform labor policies dictated by CMC and TCI—TCI sets company policy on holidays, vacation, sick leave, and insurance benefits. There also appears to be an established wage range within which the system managers set individual employee wages. This evidence strongly supports the Board's finding that their grouping in a common unit is appropriate.

B. *Functional Integration of the Business*

As discussed above regarding the single employer status finding, there is a meaningful, although not overwhelming, degree of interrelation as the three systems share common management and some centralized administration, as well as such services as public access programming coordination.[6]

The frequency of employee interchange has been regarded as a "critical factor" in ascertaining a community of interest among employees. *Spring City Knitting Co.*, 647 F.2d at 1015. In the past, field employees at Carson and Inglewood were supervised by the same individual, and scheduling for field employees at both systems was performed through the Carson office. One field employee, a CMC converter technician, works in each system as part of his regular duties.

Moreover, while field employees are assigned to an individual system, each system may "borrow" another system's employees to fill temporary staffing needs. Although there appears to be a relatively low level of employee transfers, and always for a short period of time, there is at least some degree of such interchange. In a quite small bargaining unit of 14 employees, almost any level of interchange would have some significance. The degree of employee interchange is not so great as to weigh strongly in favor of a multi-location bargaining unit, but neither is it so minimal as to preclude the designation of such a unit.

C. *Centralization of Management and Supervision*

It is significant that the multi-location unit designated by the Board mirrors the respondents' own administrative grouping. The three systems are the only systems managed by CMC, and all three are in the greater Los Angeles area.

CMC's managerial authority, maintained on behalf of the primary owners, TCI and Roseman, is primarily exercised on the poli-

**6.** The respondents contend that the Regional Director improperly relied on the prior decision that respondents constituted an integrated enterprise and thus were a single employer. Yet the respondents inconsistently contend as well that the Director failed to cite any evidence demonstrating functional integration among the respondents making a single multi-location unit appropriate.

Although the appropriateness of a bargaining unit is indeed a distinct issue from that of the scope of an employer's operation, the factors involved in evaluating each question substantially overlap. Certainly, for example, a finding that the respondents are a single integrated employer is relevant to the assessment of functional integration in determining the appropriateness of a multi-location bargaining unit.

cy level. Day-to-day labor relations are conducted at the system level upon the supervision of the system managers. This fact would tend to militate against a single multi-location bargaining unit. This is, however, offset to some extent by the fact that the system managers are hired by and must answer to CMC, as well as by the fact that certain management, budgetary, and labor relations matters are established by TCI and CMC such that the discretion available to system managers on a daily basis is somewhat circumscribed.

### D. Geographical Separation

The Carson facility, which also houses CMC, is located about 10–15 miles southeast of Inglewood and 30 miles southwest of Pomona; Pomona and Inglewood are about 40–45 miles apart.

The geographical distance between facilities is important as to whether it is feasible for all employees in a multi-location unit to participate without great difficulty in union activities. *See NLRB v. Sunset House,* 415 F.2d 545 (9th Cir.1969). It is not apparent from the record that the distance between the three systems is such as to unduly inhibit interchange between them. Indeed, the fact that employee transfers between the systems have occurred, at least on an infrequent basis, indicates that the distance is not so great as to present any severe obstacle to employee participation in union activities. *See id.* at 549.

### E. Extent of Union Organization

The multi-location unit designated by the Board is that which was sought by the union. The Supreme Court has held that the Board may "consider[ ] the extent of

[union] organization as one factor, although not the controlling factor, in its unit determination." *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. 438, 442, 85 S.Ct. 1061, 1063, 13 L.Ed.2d 951 (1965); *see also* 29 U.S.C. § 159(c)(5).

Particularly where, as here, there is no history of collective bargaining at any of the locations, and no other union is seeking to represent these employees in this or any other unit, the Board may reasonably give some weight to the petitioning union's desires for representation on a multi-location basis.[7]

### F. Conclusion

The respondents primary argument against the appropriateness of the multi-location bargaining unit is that it purportedly conflicts with an established presumption in favor of single location bargaining units.

We have frequently recognized the existence of a presumption that a single location bargaining unit, when designated by the Board, is appropriate. *See, e.g., Alaska Statebank,* 653 F.2d at 1287; *Spring City Knitting Co.,* 647 F.2d at 1013–16; *Victoria Station, Inc. v. NLRB,* 586 F.2d 672 (9th Cir.1978); *NLRB v. Lerner Stores Corp.,* 506 F.2d 706 (9th Cir.1974); *see also Sohio Petroleum Co. v. NLRB,* 625 F.2d 223 (9th Cir.1980); *NLRB v. J.C. Penney Co., Inc.,* 620 F.2d 718 (9th Cir.1980). However, a crucial aspect of each of those cases was that the *Board* had found a single location unit to be appropriate, and the *employer* contended that only a multi-location unit could be appropriate—the exact reverse from what we confront in the instant case. The question raised in those

---

7. The Board's counsel also argues that this multi-location unit is appropriate as reflective of employee wishes. Although employees' wishes cannot supplant all other considerations, "[e]mployee choice can tip the balance in determining which of two equally appropriate units should be preferred." *Pacific Southwest Airlines,* 587 F.2d at 1044.

However, there is no evidence whatsoever in the record that the employees were given any opportunity to indicate whether they wished to be represented in a single multi-location unit or separate system units. The election only allowed the respondents' employees to choose

whether or not to be represented by the union; they were not polled on which unit they favored. *See id.*

At any rate, this factor was not relied upon by the Regional Director in his decision. We must affirm the Board upon the actual ground stated in its decision. "[T]he integrity of the administrative process requires that 'courts may not accept appellate counsel's *post hoc* rationalizations for agency action …'" *NLRB v. Metropolitan Life Insurance Co.,* 380 U.S. at 444, 85 S.Ct. at 1064 (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)).

cases was not whether a multi-location unit was inappropriate, but rather whether the Board had abused its discretion by designating a smaller unit instead.

As the Sixth Circuit explained in *NLRB v. First Union Management, Inc.*, 777 F.2d 330, 334 (6th Cir.1985):

> The presumption, however, only tends to establish that a single-site unit, when requested, constitutes *an* appropriate unit. The presumption does not affect this case because we only face the question whether the bargaining unit that the Union sought and the NLRB certified constituted an appropriate unit.

Where, as here, the union requests and the Board designates a multi-location unit as appropriate, the presumption simply has no application. The presumption does not preclude designation of a larger unit, but only works to assure that a Board determination that a smaller unit is appropriate will almost never be subject to challenge. Consequently in this case, the Board is not required to "rebut" any "presumptive appropriateness of single location units," as suggested by the respondents.

After considering the "balanc[e] of salient factors" relevant to the designation of a multi-location bargaining unit, *see Spring City Knitting Co.*, 647 F.2d at 1016, particularly the striking similarity of employee skills, duties, and working conditions, we conclude that the Board acted within its broad discretion in designating a single bargaining unit for all three systems and CMC.

It may be true that the handling of day-to-day management and personnel relations by the system managers, as well the less than overwhelming extent of interrelation and employee interchange, tends to make separate bargaining units *more* appropriate. But the Board need only designate *an* appropriate unit; it need not be the *most* appropriate one. *Alaska Statebank*, 653 F.2d at 1287. The respondents have not met their burden of showing, not merely that some other unit would have been more appropriate, but that the Board's designat-

ed unit is "clearly inappropriate." *Sohio Petroleum Co.*, 625 F.2d at 226.